[No. S023804. Feb. 28, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
CRAIG EWOLDT, Defendant and Appellant.

**COUNSEL**

Quin Denvir, under appointment by the Supreme Court, and John F. Jackson for Defendant and Appellant.

Talcott, Lightfoot, Vandevelde, Woehrle & Sadowsky and Michael J. Lightfoot as Amici Curiae on behalf of Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama and Ronald A. Bass, Assistant Attorneys General, Ronald E. Niver and Gloria F. DeHart, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GEORGE, J.**—In this prosecution for committing lewd acts upon a child, evidence was admitted tending to establish that defendant had committed a prior, uncharged lewd act upon the complaining witness (his stepdaughter) and also had committed prior, uncharged lewd acts upon her older sister. In determining whether it was proper for the trial court to admit this evidence, we first consider whether, in criminal proceedings, the rule set forth in Evidence Code section 1101 (section 1101), prohibiting the use of character evidence to prove conduct on a specified occasion, remains applicable following the adoption of article I, section 28, subdivision (d), of the California Constitution (section 28(d)), an initiative measure enacted in 1982 as part of Proposition 8. We hold, for the reasons that follow, that even if the adoption of section 28(d) abrogated section 1101, the Legislature reenacted section 1101 when it amended that statute in 1986 by more than a two-thirds vote.

We next address the question whether evidence of defendant's uncharged criminal conduct was admissible under section 1101. We hold, for the reasons that follow, that the evidence was admissible to establish that the charged offenses were committed pursuant to the same design or plan used by defendant in committing the uncharged offenses. In so holding, we

disapprove our prior holdings to the contrary in *People* v. *Tassell* (1984) 36 Cal.3d 77 [201 Cal.Rptr. 567, 679 P.2d 1] and *People* v. *Ogunmola* (1985) 39 Cal.3d 120 [215 Cal.Rptr. 855, 701 P.2d 1173]. We further hold that the trial court was not required to exclude this evidence on the ground that its prejudicial effect outweighed its probative value under Evidence Code section 352.

Finally, we hold that our decision in *People* v. *Stanley* (1967) 67 Cal.2d 812 [63 Cal.Rptr. 825, 433 P.2d 913] does not require exclusion of the complaining witness's testimony that defendant commmitted an uncharged lewd act upon her, on the ground that such testimony is uncorroborated.

## Factual and Procedural History

Defendant was charged by information with four counts of committing a lewd act upon a child under the age of fourteen years (Pen. Code, § 288, subd. (a), a felony) and one count of annoying or molesting a child under the age of eighteen years (Pen. Code, § 647.6, a misdemeanor). The alleged victim of the charged offenses was defendant's stepdaughter, Jennifer. The case proceeded to trial, but a mistrial was declared when the jury was unable to reach a verdict.

At the first trial, the trial court admitted evidence that defendant had committed a prior, uncharged lewd act upon Jennifer, but excluded evidence that defendant had committed prior, uncharged lewd acts upon her older sister, Natalie.

Prior to the second jury trial, which was conducted before another judge, the trial court ruled that the evidence that defendant had committed prior, uncharged lewd acts upon Natalie was admissible. The trial court also granted the People's motion to dismiss one of the counts alleging commission of a lewd act upon a child under the age of fourteen years. On the day following this ruling, defendant asked the court to reconsider its decision allowing the admission of evidence that defendant had committed prior, uncharged lewd acts upon Natalie, and offered to stipulate "that if the jury finds that the defendant was present and committed the various acts which are the subject of these charges, . . . he did so with the requisite specific intent and that, therefore, . . . intent would no longer be an issue . . . ." The court, however, reiterated its ruling that the evidence was admissible.

Jennifer, who was 15 years of age at the time of trial, testified that her mother married defendant in 1977 when Jennifer was 3 years of age. From the time Jennifer was six or seven years of age, and continuing on a weekly

or biweekly basis until she was fourteen years of age, defendant touched Jennifer "in a way [she] didn't like." The first such incident, which was not charged in the information, occurred while Jennifer was watching television with defendant in the living room. Defendant touched either her breasts or her vaginal area; Jennifer could not remember which. She did recall that she "was scared" and "knew that it was wrong."

The incident charged as count 1 of the information occurred in 1985, when Jennifer was in the fifth grade. When she returned home from school one day and entered her parents' bedroom to greet them, defendant was in the bathroom. Telling Jennifer he had to change his clothes, he instructed her to turn around. She did so and began describing her day. Defendant said he was dressed and she could turn to face him. When Jennifer turned around, she found that defendant was naked and his penis was erect. He forced Jennifer onto the bed, fondled her vaginal area, and undressed her. Defendant again fondled Jennifer, and attempted to force her legs apart. After Jennifer cried and told defendant to stop, he did so and apologized to her, promising it would not happen again.

The incident charged as count 2 occurred in 1986 or 1987, when Jennifer was in the sixth or seventh grade. Defendant, who was naked, again assaulted Jennifer on his bed, fondling her both over and under her underwear, and asked her to undress. When she refused, he removed her clothes and attempted to force her legs apart. When Jennifer resisted and began to cry, defendant stopped.

Jennifer could not recall whether, during either of the incidents charged as counts 1 and 2, defendant penetrated her vagina with his finger, because "it had happened so often."

The incident charged as count 3 occurred in 1987, when Jennifer was in the seventh grade. On that occasion, defendant entered Jennifer's bedroom in the middle of the night while she was asleep. She awoke to find him clothed in his underwear, smelling of alcohol. Defendant uncovered his penis and told Jennifer to touch it, but she refused. When he forced her to do so, she began to cry and said she had to go to the bathroom. After using the bathroom, Jennifer proceeded toward her parents' bedroom, intending to wake her mother. Defendant grabbed her arm, pulling her toward her bedroom. They struggled, and Jennifer screamed "no," waking her mother. Jennifer told her she had had a nightmare, and slept with her mother the remainder of that night.

Jennifer did not tell anyone about defendant's conduct. She once threatened defendant she would tell someone if he did not stop, but defendant said

that in the event she did so, she "would be in real big trouble" and "it would break up the family." Jennifer remained silent, because she feared no one would believe her and felt "very confused."

The incident charged as count 4 (the misdemeanor count of violating Pen. Code, § 647.6) took place in November 1988, when Jennifer was 14 years of age. Defendant entered her bedroom while she was asleep, and she awoke when she felt him touching her breasts. She asked defendant what he was doing, and he replied he was covering her with a blanket. Jennifer could not recall whether on this occasion defendant touched her under her clothes, "because this same thing happened many times." After this occurrence, Jennifer convinced her mother to install a lock on Jennifer's bedroom door.

Shortly after this final incident, Jennifer disclosed defendant's conduct to a friend, who relayed the information to a school counselor. The counselor notified the police.

Jennifer's sister Natalie, who was 23 years of age at the time of trial, testified she was 10 or 11 years of age when her mother married defendant. Shortly after defendant began residing with them, Natalie awoke on three occasions to find defendant beside her bed, touching her breasts and vaginal area. On the first two occasions, Natalie was uncertain whether she had been dreaming. On the third occasion, when she asked defendant what he was doing, he said he was "straightening up the covers." She told him to leave, and no further incidents of this type occurred. Subsequently, however, on several occasions Natalie and her older sister, Theresa, found defendant peeking into their bedroom window while they were dressing.

Natalie never told anyone defendant had molested her, until she learned defendant had molested Jennifer.

Jennifer's mother, Karen Ewoldt, testified that, late one night, she heard Jennifer say "get out." Fearing someone had broken into the house, Ms. Ewoldt entered Jennifer's bedroom and discovered defendant "pretending like he was picking up something." On another occasion, she heard Jennifer scream and found her "running down the hall." Defendant was walking toward the kitchen. Jennifer said she had had a nightmare. She slept in her mother's bed the remainder of that night, which was unusual for her to do, and defendant slept on the living room couch, as he often did. On a third occasion, she observed defendant looking into the window of Natalie and Theresa's bedroom.

Defendant testified in his own behalf, denying that any of the incidents described by Jennifer had occurred and that he ever had peeked into Natalie and Theresa's bedroom window.

The jury found defendant guilty as charged in counts 1, 3 and 4, but was unable to reach a verdict on count 2, which subsequently was dismissed by the trial court. Defendant was sentenced to a term of eight years in prison.

The Court of Appeal reversed the judgment, holding that the trial court erred in admitting Natalie's testimony. For the guidance of the trial court on remand, the Court of Appeal further held that Jennifer's uncorroborated testimony regarding defendant's uncharged misconduct with her was inadmissible under our decision in *People* v. *Stanley, supra,* 67 Cal.2d 812. We granted the People's petition for review.

DISCUSSION

I

Defendant contends, and the Court of Appeal agreed, that admission of defendant's prior, uncharged misconduct with Natalie violated section 1101, subdivision (a), which prohibits the admission of "evidence of a person's character . . . to prove his or her conduct on a specified occasion." In response, the People claim that, as a result of the enactment of section 28(d), section 1101 no longer is in effect. On prior occasions, we have taken note of this issue, without resolving it. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1226 [283 Cal.Rptr. 144, 812 P.2d 163]; *People* v. *Harris* (1989) 47 Cal.3d 1047, 1081 [255 Cal.Rptr. 352, 767 P.2d 619]; *People* v. *Tassell, supra,* 36 Cal.3d 77, 82, fn. 1.) We now have occasion to do so and hold, for the reasons that follow, that even if the adoption of section 28(d) abrogated section 1101, the Legislature reenacted section 1101 in 1986 when it amended that statute by more than a two-thirds vote.

Section 28(d) provides, in pertinent part: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . . Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103."

Defendant initally contends, following the reasoning of the Court of Appeal in *Newman* v. *Superior Court* (1986) 179 Cal.App.3d 377, 382 [224 Cal.Rptr. 538], and *People* v. *Perkins* (1984) 159 Cal.App.3d 646, 649-650 [205 Cal.Rptr. 625], that the foregoing exclusion of Evidence Code section 1103 from the ambit of section 28(d) must be interpreted as excluding section 1101 as well, because "[s]ection 1103 is an exception to section 1101 and cannot exist as an exception to a nonexistent rule." (*Newman* v. *Superior*

*Court, supra,* 179 Cal.App.3d 377, 382; *People* v. *Perkins, supra,* 159 Cal.App.3d 646, 650; but see *People* v. *Scott* (1987) 194 Cal.App.3d 550, 554, fn. 4 [239 Cal.Rptr. 588].) We need not, and do not, resolve this question, however, because we conclude, as did the Court of Appeal in *People* v. *Scott, supra,* 194 Cal.App.3d 550, 554-556, that even if section 1101 was repealed by implication by section 28(d), the Legislature has reenacted the statute.

In 1986, the Legislature amended subdivision (b) of section 1101, in response to this court's decision in *People* v. *Tassell, supra,* 36 Cal.3d 77, by adding the following to the list of examples of matters that could be proved by evidence of other acts: "whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented . . . ." (Stats. 1986, ch. 1432, §§ 1, 2, pp. 5129-5130.) Section 9 of article IV of the California Constitution provides, in pertinent part, that "[a] section of a statute may not be amended unless the section is re-enacted as amended." By amending section 1101, the Legislature thus reenacted, in its entirety, section 1101 as amended. The measure was passed by the votes of more than two-thirds of the members of both houses of the Legislature (39-0 in the Senate [4 Sen. J. (1985-1986 Reg. Sess.) p. 7595] and 80-0 in the Assembly [6 Assem. J. (1985-1986 Reg. Sess.) pp. 9606-9607]). Accordingly, by virtue of the 1986 legislation, the Legislature reenacted section 1101 by more than a two-thirds vote.

The People contend that the Legislature's action in 1986 should not be viewed as an enactment of section 1101 within the meaning of section 28(d), asserting that the reenactment of section 1101 was simply a technical reenactment, compelled by the provisions of article IV, section 9, of the California Constitution. They contend this court's decision in *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744] establishes that such a reenactment does not fall within the scope of section 28(d).

In our view, *In re Lance W.* is distinguishable from the present case. In *Lance W.* we rejected an argument that the Legislature, by amending Penal Code section 1538.5 by a unanimous vote subsequent to the adoption of section 28(d), reestablished violation of the California Constitution as a basis for the exclusion of evidence. Penal Code section 1538.5, however, establishes the procedure governing motions to suppress evidence obtained as a result of a search or seizure. It does not establish any grounds for the exclusion of evidence. The argument addressed in *Lance W.*, therefore, was not whether the amendment to section 1538.5 constituted a reenactment of that statute, but whether the effect of such reenactment was to require that

section 1538.5 be applied as it had been prior to the adoption of section 28(d). Observing that the amendment at issue was termed "a noncontroversial 'clean-up' amendment," we concluded it was unlikely "that the Legislature understood or intended that such far-reaching consequences—virtually a legislative repeal of the 'Truth-in-Evidence' section of Proposition 8 —would follow an amendment so casually proposed and adopted without opposition." (*Lance W., supra,* 37 Cal.3d at p. 894.) Furthermore, we pointed out that this understanding on the part of the Legislature was confirmed by its enactment of a companion bill at the same legislative session, declaring that the amendment of section 1538.5 did not "create any new grounds for exclusion of evidence that did not exist prior to this act." (37 Cal.3d at p. 894.) In light of this legislative history, the decision in *Lance W.* held that "[t]he conclusion that the Legislature did not intend to reinstate independent state grounds for excluding unlawfully seized evidence is inescapable." (*Id.* at p. 896, fn. 18.)

The present case differs from *Lance W.* in several important respects. Unlike Penal Code section 1538.5, section 1101 sets forth a substantive rule limiting the admission of relevant evidence. This rule was reenacted by a two-thirds vote when section 1101 was amended in 1986. In contrast to the circumstances governing *Lance W.,* the legislation now before us would become a complete nullity were we to hold that the 1986 amendment of section 1101 did not reenact the statute, and a substantive rule of law governing the admission of evidence, approved by more than two-thirds of each house of the Legislature, would have no effect. Such a result would be inconsistent with the dictates of the introductory clause of section 28(d) regarding the effect of statutes passed by a two-thirds vote.

Furthermore, unlike the situation in *Lance W.,* in which it was inconceivable the Legislature had effected a virtual repeal of the "Truth-in-Evidence" section of Proposition 8 casually and without opposition, in the present situation it is by no means implausible that the Legislature chose to retain the prohibition against admission of character evidence to prove conduct on a specified occasion, embodied in section 1101, subdivision (a). Such a rule excluding evidence that is relevant solely to demonstrate criminal disposition "was a part of 'the early law of England' " and currently is in force in "all American jurisdictions, either by statute or case law . . . ." (Imwinkelried & Méndez, *Resurrecting California's Old Law on Character Evidence* (1992) 23 Pacific L.J. 1005, 1006, 1041.) The 1986 amendment to section 1101, specifying an additional circumstance under which evidence of uncharged misconduct may be admitted to prove a matter other than criminal disposition, establishes that more than two-thirds of both houses of the Legislature favored retention of the substantive evidentiary rules embodied in section 1101, as amended.

We conclude, therefore, that even if the adoption of section 28(d) abrogated Evidence Code section 1101, the Legislature reenacted that statute when it amended it in 1986 by more than a two-thirds vote. We proceed, therefore, to determine whether, in the present case, the challenged evidence of defendant's uncharged misconduct was admissible under section 1101.

II

A

Subdivision (a) of section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition.[1] In the present case, evidence of defendant's prior misconduct is relevant to prove a material fact other than defendant's criminal disposition, because the similarity between the circumstances of the prior acts and the charged offenses supports the inference that defendant committed the charged offenses pursuant to the same design or plan defendant used to commit the uncharged misconduct.

"The presence of a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done." (1A Wigmore, Evidence (Tillers rev. ed. 1983) § 102, p. 1666.) For example, a letter written by the defendant stating he planned to commit a certain offense would be relevant evidence in a subsequent prosecution of the defendant for committing that offense. (See, e.g., *People* v. *Nicolaus* (1991) 54 Cal.3d 551, 565, 575-577 [286 Cal.Rptr. 628, 817 P.2d 893].) The existence of such a design or plan also may be proved circumstantially by evidence that the defendant has performed acts having "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." (2 Wigmore,

---

[1]Section 1101 states: "(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act. [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

Evidence (Chadbourn rev. ed. 1979) § 304, p. 249, italics omitted.) Evidence of a common design or plan, therefore, is not used to prove the defendant's intent or identity but rather to prove that the defendant engaged in the conduct alleged to constitute the charged offense.[2]

As the following cases illustrate, this court on numerous occasions has recognized that evidence of uncharged similar misconduct may be employed to establish a common design or plan. In *People* v. *Lisenba* (1939) 14 Cal.2d 403 [94 P.2d 569], the body of the defendant's wife was found floating in a fish pond in the garden of their home. She had suffered a snakebite on her foot, but had died by drowning. A confederate of the defendant testified that he and the defendant deliberately had inflicted the snakebite and, when that did not prove fatal, had drowned the deceased in a bathtub before depositing her body in the fish pond. Their purpose was to obtain the proceeds of an insurance policy that included a double-indemnity provision applicable in the event the deceased died accidentally.

The trial court admitted evidence establishing that, three years earlier, the defendant's former wife, who also had been insured under a provision providing double indemnity for accidental death, had drowned in a bathtub. Evidence was admitted demonstrating that, at the time of her death, she was recovering from serious injuries sustained in an automobile collision that the

---

[2]This distinction, between the use of evidence of uncharged acts to establish the existence of a common design or plan as opposed to the use of such evidence to prove intent or identity, is subtle but significant. Evidence of *intent* is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense. "In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it." (2 Wigmore, *supra*, (Chadbourn rev. ed. 1979) § 300, p. 238.) For example, in a prosecution for shoplifting in which it was conceded or assumed that the defendant left the store without paying for certain merchandise, the defendant's uncharged similar acts of theft might be admitted to demonstrate that he or she did not inadvertently neglect to pay for the merchandise, but rather harbored the intent to steal it.

Evidence of a common design or plan is admissible to establish that the defendant committed the *act* alleged. Unlike evidence used to prove intent, where the act is conceded or assumed, "[i]n proving design, the act is still undetermined . . . ." (2 Wigmore, *supra*, (Chadbourn rev. ed. 1979) § 300, p. 238.) For example, in a prosecution for shoplifting in which it was conceded or assumed that the defendant was present at the scene of the alleged theft, evidence that the defendant had committed uncharged acts of shoplifting in a markedly similar manner to the charged offense might be admitted to demonstrate that he or she took the merchandise in the manner alleged by the prosecution.

Evidence of *identity* is admissible where it is conceded or assumed that the charged offense was committed by someone, in order to prove that the defendant was the perpetrator. For example, in a prosecution for shoplifting in which it was conceded or assumed that a theft was committed by an unidentified person, evidence that the defendant had committed uncharged acts of shoplifting in the same unusual and distinctive manner as the charged offense might be admitted to establish that the defendant was the perpetrator of the charged offense. (2 Wigmore, *supra*, (Chadbourn rev. ed. 1979) § 410, p. 477.)

defendant deliberately had caused. When she survived the collision, the defendant drowned her in the bathtub for the purpose of collecting the insurance proceeds. This court held that evidence of the defendant's prior misconduct was admissible to establish a common design or plan to murder his wives for financial gain. (*People* v. *Lisenba*, *supra*, 14 Cal.2d 403, 427-428; see also *People* v. *Schader* (1969) 71 Cal.2d 761, 776-777 [80 Cal.Rptr. 1, 457 P.2d 841]; *People* v. *Kelley* (1967) 66 Cal.2d 232, 239 [57 Cal.Rptr. 363, 424 P.2d 947]; *People* v. *Gosden* (1936) 6 Cal.2d 14, 24-25 [56 P.2d 211].)

In *People* v. *Peete* (1946) 28 Cal.2d 306 [169 P.2d 924], the defendant was employed by a Mrs. Logan to provide "domestic service and care" for Mrs. Logan's elderly husband, who was in a state of "senile dementia." (*Id.* at p. 309.) While defendant was so employed, Mrs. Logan disappeared. Two days later, the defendant and her husband moved into Mrs. Logan's house and caused Mr. Logan to be confined in a mental hospital, asserting Mr. Logan had attacked his wife. In response to inquiries concerning Mrs. Logan's whereabouts, the defendant asserted that Mrs. Logan had left to seek plastic surgery necessitated by the attack perpetrated by her husband and planned never to return. The defendant treated Mrs. Logan's home as her own, opening Mrs. Logan's mail and forging Mrs. Logan's name to certain documents.

Nearly seven months after Mrs. Logan disappeared, her body was found buried in the backyard of her home. She had been shot in the back of the neck, the bullet having struck the fourth cervical vertebra, narrowly missing the spinal cord. Death was caused by two depressed fractures of the skull. The butt of a revolver the defendant had stolen "fitted perfectly" the depressions in the deceased's skull. Blood and human hair were found on the weapon. (*People* v. *Peete*, *supra*, 28 Cal.2d at pp. 310-313.)

Evidence was introduced that, 24 years earlier, defendant's landlord, Mr. Denton, had disappeared 2 weeks after leasing his residence to the defendant. In response to inquires regarding Denton's whereabouts, the defendant asserted Denton had been shot in the arm by an unknown woman. The defendant rented Denton's residence to a third party, attempted to sell the residence, went through Denton's papers, and forged Denton's name to certain documents.

More than three months after Denton's disappearance, his body was found buried beneath his residence. He had been shot in the back of the neck, the bullet having struck the fourth cervical vertebra and severed the spinal cord. The defendant had been convicted of that murder and had spent the following 18 years in prison.

This court held admissible the evidence of the prior murder committed by the defendant: "Evidence concerning another offense is relevant to prove that a death resulted from the execution of a scheme when in the light of the circumstances of the crime sought to be proved, it indicates the existence of such a scheme. When a defendant's conduct in connection with the previous crime bears such similarity in significant respects to his conduct in connection with the crime charged as naturally to be explained as caused by a general plan, the similarity is not merely coincidental, but indicates that the conduct was directed by design. [Citations.] . . . [¶] The striking similarity in significant respects between defendant's conduct in the Denton case and her conduct in connection with Mrs. Logan's death strongly indicates a scheme by defendant to acquire the property of a suitable victim by murder." (*People* v. *Peete, supra*, 28 Cal.2d 306, 317-318.)

In *People* v. *Ing* (1967) 65 Cal.2d 603 [55 Cal.Rptr. 902, 422 P.2d 590], the defendant, a physician, was convicted of three counts of raping a patient. The patient testified that she consulted the defendant because she suspected she was pregnant, and that she desired an abortion. The defendant examined the victim, confirmed she was pregnant, and had her return to his office on successive occasions. On each occasion, the defendant administered an injection that caused her to "feel dizzy," and then had sexual intercourse with her.

The trial court admitted the testimony of two former patients of the defendant, who testified they had consulted the defendant to determine whether they were pregnant and, if so, to procure abortions. In each instance, the defendant confirmed the patient was pregnant, administered an injection that rendered her unconscious, and then had sexual intercourse with her. A former employee of the defendant also testified that the defendant had had sexual intercourse with her after administering injections.

This court ruled the challenged evidence was admissible, stating: "In view of the striking similarities between the other offenses and the ones charged the evidence was relevant on the question of a common scheme or plan to commit rape . . . ." (*People* v. *Ing, supra*, 65 Cal.2d 603, 612; see also *People* v. *Cramer* (1967) 67 Cal.2d 126, 129-130 [60 Cal.Rptr. 230, 429 P.2d 582].)

In *People* v. *Sam* (1969) 71 Cal.2d 194, 205 [77 Cal.Rptr. 804, 454 P.2d 700], this court ruled that the trial court improperly admitted evidence of uncharged misconduct to establish a common design or plan, because the evidence suggested the defendant had acted spontaneously in each instance, rather than pursuant to a plan. The defendant's conviction of murder was

based upon evidence that, during an altercation with the victim, the defendant had "stomped his foot into the [victim's] stomach." (*Id.* at p. 199.) The victim died two weeks later. Over defense objection, evidence was admitted indicating that, during a drunken quarrel, the defendant had kicked his former girlfriend in the ribs, resulting in her hospitalization, and that, on another occasion, the defendant had kicked yet another person during an altercation.

This court reversed the judgment, holding that the evidence of the defendant's uncharged misconduct was inadmissible to demonstrate a common design or plan, because "no connecting link between the prior and present acts was alleged or could reasonably be inferred. The acts were independent of one another and apparently spontaneous in each instance." (*People* v. *Sam, supra,* 71 Cal.2d 194, 205.)

In *People* v. *Archerd* (1970) 3 Cal.3d 615 [91 Cal.Rptr. 397, 477 P.2d 421], the defendant was convicted of murdering two of his wives and a nephew by the unusual means of administering a lethal dose of insulin. In a somewhat brief discussion, this court held that evidence that the defendant had used the same means to murder a third wife, the ex-husband of another wife, and a friend, was admissible "to show a common plan or scheme." (*Id.* at p. 620.)

In *People* v. *Thomas* (1978) 20 Cal.3d 457 [143 Cal.Rptr. 215, 573 P.2d 433], the defendant was convicted of committing lewd acts upon his nine-year-old daughter and his twelve-year-old stepdaughter. The trial court admitted evidence that the defendant had molested another daughter more than 10 years earlier, starting when she was 6 years of age and continuing until she was 14 years of age. This court stated that such evidence of prior misconduct "committed with persons other than the prosecuting witness . . . is admissible to show a common design or plan where the prior offenses (1) are not too remote in time, (2) are similar to the offense charged, and (3) are committed upon persons similar to the prosecuting witness. [Citations.]" (*Id.* at p. 465; see also *People* v. *Pendleton* (1979) 25 Cal.3d 371, 376-378 [158 Cal.Rptr. 343, 599 P.2d 649].) This court went on to hold, however, that this evidence of the defendant's prior, uncharged act of molestation should have been excluded, because it occurred more than 10 years earlier. Although recognizing that " 'usually' the remoteness of evidence 'goes to its weight, not to its admissibility' [citations]," this court ruled that the trial court

abused its discretion in admitting evidence of the defendant's prior misconduct, because that misconduct was " 'too remote in time to be relevant to the present charges.' " (20 Cal.3d at p. 466.)[3]

In *People* v. *Tassell*, *supra*, 36 Cal.3d 77, this court departed from its previous approach to the question of the admissibility of uncharged criminal acts to demonstrate a common design or plan. The victim in *Tassell* was a waitress employed in a restaurant in which the defendant was a customer. When the restaurant closed at 1:30 a.m., the victim agreed to give the defendant a ride home in her van. The victim testified that when they reached the defendant's destination, he attempted to kiss her and, when she resisted, grabbed her by the neck and threw her into the rear of the van, where he later raped her and forced her to orally copulate him.

Evidence was introduced indicating that, four years earlier, the defendant had engaged in a similar attack upon a barmaid after she left her employment at a bar in which the defendant was a customer. When the bar closed, the defendant followed the victim to her automobile and attempted to kiss her as she started the engine. When she resisted, he forced his way into the vehicle and grabbed her neck as he drove to a secluded spot. When they arrived, the defendant forced the victim to orally copulate him, forcibly engaged in anal intercourse with the victim, and raped her.

Additional evidence was introduced indicating that on a night three years prior to the commission of the charged offense, the defendant picked up a female hitchhiker, pulled off the road, and attempted to kiss her. When she resisted, he grabbed her by the throat and forced her to orally copulate him, unsuccessfully attempted anal intercourse, and raped the victim.

This court held evidence of the defendant's prior criminal acts was inadmissible to establish a common design or plan. Unlike the cases discussed above in which this court determined whether the similarities between the uncharged misconduct and the charged offense were sufficient to demonstrate the existence of a common design, *Tassell* promulgated a new rule that evidence of uncharged misconduct could be used to demonstrate a common design or plan only "where it is claimed that there is, in truth, a 'single conception or plot' of which the charged and uncharged crimes are individual manifestations. [Citation.] Absent such a 'grand design,' talk of 'common plan or scheme' is really nothing but the bestowing of a respectable label on a disreputable basis for admissibility—the defendant's

---

[3]As discussed later in this opinion, the degree to which the remoteness in time of evidence of uncharged misconduct will affect the probative value of such evidence in establishing a common design or plan will vary, depending upon the circumstances of each case.

disposition." (*People* v. *Tassell, supra,* 36 Cal.3d 77, 84, fn. omitted.) The decision went on to explain: "No rational argument would support a contention that the three sets of sex crimes were part of one larger plan. There being no issue of identity, it is immaterial whether the modus operandi of the charged crime was similar to that of the uncharged offenses. While the People rely on the 'common plan or scheme' rationale for admissibility, under the circumstances that is merely a euphemism for 'disposition.'" (*Id.* at p. 88-89.)

██ ██ The decision in *People* v. *Tassell, supra,* 36 Cal.3d 77, is based upon the erroneous premise that a common design or plan cannot be established by evidence reflecting that the defendant committed markedly similar acts of misconduct against similar victims under similar circumstances, unless all of these acts are part of a single, continuing conception or plot. As this court recognized in *People* v. *Lisenba, supra,* 14 Cal.2d 403, however, evidence that the defendant, on two separate occasions, married the victim, obtained insurance on her life, and then drowned her in a manner calculated to make it appear that her death was accidental, was admissible to demonstrate that both crimes were committed pursuant to a common design, despite the fact that there was nothing to indicate that the defendant had formed a single, continuing plot to kill both of his wives. Contrary to its holding in *Tassell,* this court in *Lisenba* and its progeny held that it is relevant that the modus operandi of uncharged offenses committed by a defendant is markedly similar to the charged offense, even when the evidence is admitted not to prove identity or intent, but to establish that the uncharged offenses and the charged offense are manifestations of a common design or plan. (2 Wigmore, *supra,* (Chadbourn rev. ed. 1979) § 304, p. 249; contra, 1 McCormick on Evidence (4th ed. 1992) § 190, pp. 800-801; Imwinkelried, Uncharged Misconduct Evidence (1984) § 3:23, p. 61.) The decision in *Tassell* failed to recognize that evidence of similar, uncharged misconduct may be used not only to prove intent or identity, but also to show a common design or plan. As we have explained, evidence of a common design or plan is admitted not to prove the defendant's intent or identity, but to prove that the defendant engaged in the conduct alleged to constitute the charged offense. (*Ante,* pp. 393-394.) Such evidence, therefore, is not admitted to establish that the defendant has a criminal disposition or bad character, but to prove that he or she committed the charged offense pursuant to the same design or plan used in committing the uncharged criminal acts.

In adopting its novel, restricted view of the admissibility of evidence of uncharged criminal acts to establish a common design or plan under section 1101, the court in *Tassell* also overlooked the Law Revision Commission comment, accompanying the original enactment of section 1101 in 1965,

that explicitly noted that subdivision (b) of the statute was intended to codify existing law—including, specifically, the decision in *People* v. *Lisenba, supra*, 14 Cal.2d 403: "Section 1101 does not prohibit the admission of evidence of misconduct when it is offered as evidence of some other fact in issue, such as motive, *common scheme or plan*, preparation, intent, knowledge, identity, or absence of mistake or accident. Subdivision (b) of Section 1101 makes this clear. *This codifies existing law. People v. Lisenba, 14 Cal.2d 403, 94 P.2d 569 (1939) (prior crime admissible to show general criminal plan and absence of accident) . . . .*" (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 1101, p. 10, italics added.)

The flawed reasoning of *Tassell* produced an equally flawed result in *People* v. *Ogunmola, supra*, 39 Cal.3d 120, 123. The defendant in that case, a gynecologist, was convicted of raping two patients in the course of conducting pelvic examinations. Two other patients testified that the defendant had raped them in the same manner. In each instance, the crime was alleged to have occurred while the "victim was lying on her back on an examination table with her knees bent and her feet in stirrups. A paper drape covered her knees, blocking her vision of all but defendant's head and chest. Each testified that the nurse left the room after defendant had obtained a pap smear and before the bimanual examination." (*Id.* at p. 122, fn. omitted.) This court concluded the challenged evidence was inadmissible, because neither the identity of the alleged perpetrator, nor his intent, was in issue.[4]

It is difficult to imagine a stronger example of separate crimes, committed pursuant to a common design or plan, than the offenses involved in *Ogunmola*. The marked similarity between the uncharged criminal acts and the charged offenses constituted strong circumstantial evidence that the defendant had developed a plan to engage in sexual intercourse with his patients without their consent and in the unusual manner described.

Despite the decisions in *Tassell* and *Ogunmola*, this court in *People* v. *Ruiz* (1988) 44 Cal.3d 589 [244 Cal.Rptr. 200, 749 P.2d 854] held that evidence establishing that the defendant committed a similar but unconnected offense could be admitted to demonstrate that the defendant committed the charged offense. In *Ruiz*, the defendant was convicted in a joint trial of murdering

---

[4]We since have held, in *People* v. *Daniels* (1991) 52 Cal.3d 815, 857-858 [277 Cal.Rptr. 122, 802 P.2d 906], "that defendant's plea [of not guilty] does put the elements of the crime in issue for the purpose of deciding the admissibility of evidence [of uncharged misconduct], unless the defendant has taken some action to narrow the prosecution's burden of proof." (Fns. omitted.) In *Estelle* v. *McGuire* (1991) 502 U.S. 62, __ [116 L.Ed.2d 385, 397, 112 S.Ct. 475, 481], the high court stated, "[T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense."

two of his wives, Tanya and Pauline, as well as Pauline's son. In ruling that the trial court properly denied the defendant's motion to sever the charge of murdering Tanya from the remaining charges, this court held that evidence that the defendant had murdered Pauline would have been admissible in a separate trial for the murder of Tanya.

Tanya had disappeared in 1975 under suspicious circumstances. She had not announced any intention of departing, and the defendant appeared unconcerned by her absence. No one heard from her again, and her body never was found. In 1978, after the defendant married Pauline, she and her son, Tony, disappeared under suspicious circumstances. Their bodies later were found buried outside the house where the defendant and Pauline had lived. Physical evidence discovered with the bodies, including bullet fragments, linked the defendant to the killings.

Although noting "the question is close," this court held that "there were sufficient similarities between the Tanya charges and the Pauline/Tony charges" for the trial court to admit evidence of the "Pauline/Tony charges" in a separate trial of the "Tanya charges." (*People* v. *Ruiz, supra*, 44 Cal.3d 589, 605.) We observed: "The fact that defendant had killed Pauline was quite relevant to the question whether he had killed Tanya; indeed, Pauline's death was relevant to the critical issue whether Tanya too had died of some criminal agency. [Citation.]" (*Id.* at p. 606; see also *People* v. *Douglas* (1990) 50 Cal.3d 468, 510-511 [268 Cal.Rptr. 126, 788 P.2d 640].) Although there was no indication that the defendant had murdered both Pauline and Tanya pursuant to a *single*, continuing conception or plot, as required by the decisions in *Tassell* and *Ogunmola* in order to justify the admission of the challenged evidence, this court, without discussing or attempting to distinguish those decisions, held that this evidence was admissible.

In light of their anomalous position in more than 50 years of California case law, we overrule *People* v. *Tassell, supra*, 36 Cal.3d 77, and *People* v. *Ogunmola, supra*, 39 Cal.3d 120, to the extent they hold that evidence of a defendant's uncharged similar misconduct is admissible to establish a common design or plan only where the charged and uncharged acts are part of a single, continuing conception or plot.[5] We hold instead that evidence of a

---

[5]Justice Mosk asserts in his dissenting opinion that we should adhere to the decision in *Tassell* as a matter of stare decisis. (*Post*, at pp. 408, 412.) We disagree. The principle of stare decisis would not be served by following *Tassell* because, as we have shown, the *Tassell* decision itself is at odds with an otherwise consistent line of authority dating back more than 50 years, including the decision in *People* v. *Ruiz, supra*, 44 Cal.3d 589, decided by this court 4 years after *Tassell*.

Justice Mosk notes that the decision in *Ruiz* cited *Tassell* with approval. This citation appears in the discussion of the general principles governing the denial of a motion for severance when the disputed evidence would have been admissible in separate trials. (44 Cal.3d at p. 605.) The decision in *Tassell* is not mentioned, however, in the discussion of whether the defendant's uncharged misconduct in *Ruiz* was admissible. (44 Cal.3d at pp.

defendant's uncharged misconduct is relevant where the uncharged misconduct and the charged offense are sufficiently similar to support the inference that they are manifestations of a common design or plan.

■ In determining whether evidence of uncharged misconduct is relevant to demonstrate a common design or plan, it is useful to distinguish the nature and degree of similarity (between uncharged misconduct and the charged offense) required in order to establish a common design or plan, from the degree of similarity necessary to prove intent or identity.[6]

The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. (See *People* v. *Robbins, supra,* 45 Cal.3d 867, 880.) "[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . ." (2 Wigmore, *supra,* (Chadbourn rev. ed. 1979) § 302, p. 241.) In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' [Citations.]" (*People* v. *Robbins, supra,* 45 Cal.3d 867, 879.)

■ A greater degree of similarity is required in order to prove the existence of a common design or plan. As noted above, in establishing a common design or plan, evidence of uncharged misconduct must demonstrate "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." (2 Wigmore, *supra,* (Chadbourn rev. ed. 1979) § 304, p. 249, italics omitted.) "[T]he difference between requiring similarity, for acts negativing innocent intent, and requiring common features indicating common design, for acts showing design, is a difference of degree rather than of kind; for to be similar involves having common features, and to have common features is

605-606.) Instead, this court relied upon the decision in *People* v. *Archerd, supra,* 3 Cal.3d 615, which, unlike *Tassell,* did *not* require that evidence of uncharged misconduct be part of a single, continuous conception or plot in order to be admissible.

[6]In addition to demonstrating the existence of a common design or plan, uncharged conduct may be relevant to establish the following, among other matters: motive (*People* v. *Daniels, supra,* 52 Cal.3d 815), knowledge (*People* v. *Schader, supra,* 71 Cal.2d 761, 776-777; *People* v. *Morani* (1925) 196 Cal. 154, 158 [236 P. 135]), intent (*People* v. *Robbins* (1988) 45 Cal.3d 867, 879 [248 Cal.Rptr. 172, 755 P.2d 355]; *People* v. *Morani, supra,* 196 Cal. 154, 158), and identity (*People* v. *Miller* (1990) 50 Cal.3d 954, 987 [269 Cal.Rptr. 492, 790 P.2d 1289]; *People* v. *Malone* (1988) 47 Cal.3d 1, 21 [252 Cal.Rptr. 525, 762 P.2d 1249]).

merely to have a high degree of similarity." (*Id.* at pp. 250-251, italics omitted; see also 1 McCormick, *supra*, § 190, p. 805.)

To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. For example, evidence that a search of the residence of a person suspected of rape produced a written plan to invite the victim to his residence and, once alone, to force her to engage in sexual intercourse would be highly relevant even if the plan lacked originality. In the same manner, evidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts. Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense. (See *People* v. *Ruiz, supra,* 44 Cal.3d 589, 605-606.)

■ The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. (*People* v. *Miller, supra,* 50 Cal.3d 954, 987.) "The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." (1 McCormick, *supra*, § 190, pp. 801-803.)

■ In the present case, the victims of both the uncharged misconduct and the charged offenses were defendant's stepdaughters, who were residing in defendant's home, and the acts occurred when the victims were of a similar age. On three occasions, defendant molested Natalie at night while she was asleep in her bed. When discovered, defendant asserted he was only "straightening up the covers." In two of the charged offenses, defendant molested Jennifer in an almost identical fashion and, when discovered, proffered a similar excuse. On one occasion prior to the commission of the charged offenses, defendant touched either Jennifer's breasts or her vaginal area. This marked the beginning of an ongoing pattern of molesting Jennifer. We conclude, therefore, that evidence of defendant's uncharged misconduct shares sufficient common features with the charged offenses to support the inference that both the uncharged misconduct and the charged offenses are manifestations of a common design or plan. Such evidence is relevant to establish that defendant committed the charged offenses in accordance with that plan.

B

 Our conclusion that section 1101 does not require exclusion of the evidence of defendant's uncharged misconduct, because that evidence is relevant to prove a relevant fact other than defendant's criminal disposition, does not end our inquiry. Evidence of uncharged offenses "is so prejudicial that its admission requires extremely careful analysis. [Citations.]" (*People* v. *Smallwood* (1986) 42 Cal.3d 415, 428 [228 Cal.Rptr. 913, 722 P.2d 197]; see also *People* v. *Thompson* (1988) 45 Cal.3d 86, 109 [246 Cal.Rptr. 245, 753 P.2d 37].) "Since 'substantial prejudicial effect [is] inherent in [such] evidence,' uncharged offenses are admissible only if they have *substantial* probative value." (*People* v. *Thompson* (1980) 27 Cal.3d 303, 318 [165 Cal.Rptr. 289, 611 P.2d 883], italics in original, fn. omitted.)

Although the evidence of defendant's uncharged criminal conduct in this case is relevant to establish a common design or plan, to be admissible such evidence "must not contravene other policies limiting admission, such as those contained in Evidence Code section 352. [Citations.]" (*People* v. *Thompson, supra*, 45 Cal.3d at p. 109.) We thus proceed to examine whether the probative value of the evidence of defendant's uncharged offenses is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

The principal factor affecting the probative value of the evidence of defendant's uncharged offenses is the tendency of that evidence to demonstrate the existence of a common design or plan. That tendency is strong. Defendant's uncharged misconduct with Natalie was committed in a manner nearly identical to that of two of the charged offenses, and the charged and uncharged acts together suggested a planned course of action rather than a series of spontaneous events. Natalie testified that the defendant molested her on three occasions, and Jennifer testified that defendant's uncharged misconduct with her was the beginning of an ongoing pattern of frequent molestations. Together, this constitutes convincing evidence that defendant was acting pursuant to a common design or plan.

The probative value of evidence of uncharged misconduct also is affected by the extent to which its source is independent of the evidence of the charged offense. For example, if a witness to the uncharged offense provided a detailed report of that incident without being aware of the circumstances of the charged offense, the risk that the witness's account may have been influenced by knowledge of the charged offense would be eliminated and the probative value of the evidence would be enhanced. The probative value of

such evidence would increase further if independent evidence of additional instances of similar misconduct, committed pursuant to the same design or plan, were produced. These factors are of limited significance in the present case, however, because it was only after learning that Jennifer had made a similar accusation that Natalie accused defendant of molesting her. The source of Natalie's testimony, therefore, is not wholly independent of the evidence of the charged offenses.

On the other side of the scale, the prejudicial effect of this evidence is heightened by the circumstance that defendant's uncharged acts did not result in criminal convictions. This circumstance increased the danger that the jury might have been inclined to punish defendant for the uncharged offenses, regardless whether it considered him guilty of the charged offenses, and increased the likelihood of "confusing the issues" (Evid. Code, § 352), because the jury had to determine whether the uncharged offenses had occurred.

The testimony describing defendant's uncharged acts, however, was no stronger and no more inflammatory than the testimony concerning the charged offenses. This circumstance decreased the potential for prejudice, because it was unlikely that the jury disbelieved Jennifer's testimony regarding the charged offenses but nevertheless convicted defendant on the strength of Natalie's testimony or Jennifer's testimony regarding the uncharged offenses, or that the jury's passions were inflamed by the evidence of defendant's uncharged offenses.

The circumstance that defendant's uncharged misconduct with Natalie occurred approximately 12 years prior to trial does not, in the context of this case, significantly lessen the probative value of this evidence, because only a few years elapsed between the time defendant last molested Natalie and the time he began his ongoing pattern of molesting Jennifer. In *People* v. *Ing, supra,* 65 Cal.2d 603, 612, we held admissible evidence of uncharged misconduct even though one of the prior offenses was committed 15 years before the charged offenses. (See also *People* v. *Douglas, supra,* 50 Cal.3d 468, 511.)

Considering all of the circumstances, we conclude the trial court did not abuse its discretion in admitting the evidence of defendant's uncharged misconduct.

Our holding does not mean that evidence of a defendant's similar uncharged acts that demonstrate the existence of a common design or plan will be admissible in all (or even most) criminal prosecutions. In many cases the

prejudicial effect of such evidence would outweigh its probative value, because the evidence would be merely cumulative regarding an issue that was not reasonably subject to dispute. (*People* v. *Schader, supra,* 71 Cal.2d 761, 775.) This is so because evidence of a common design or plan is admissible only to establish that the defendant engaged in the conduct alleged to constitute the charged offense, not to prove other matters, such as the defendant's intent or identity as to the charged offense. (*Ante,* pp. 393-394.)

For example, in most prosecutions for crimes such as burglary and robbery, it is beyond dispute that the charged offense was committed by someone; the primary issue to be determined is whether the defendant was the perpetrator of that crime. Thus, in such circumstances, evidence that the defendant committed uncharged offenses that were sufficiently similar to the charged offense to demonstrate a common design or plan (but not sufficiently distinctive to establish identity) ordinarily would be inadmissible. Although such evidence is relevant to demonstrate that, assuming the defendant was present at the scene of the crime, the defendant engaged in the conduct alleged to constitute the charged offense, if it is beyond dispute that the alleged crime occurred, such evidence would be merely cumulative and the prejudicial effect of the evidence of uncharged acts would outweigh its probative value. In ruling upon the admissibility of evidence of uncharged acts, therefore, it is imperative that the trial court determine specifically what the proffered evidence is offered to prove, so that the probative value of the evidence can be evaluated for that purpose.

For this same reason, the evidence of defendant's uncharged misconduct in the present case is inadmissible for the purpose of proving defendant's intent as to the charges of committing lewd acts. Evidence of intent is relevant to establish that, assuming the defendant committed the alleged conduct, he or she harbored the requisite intent. In testifying regarding the charges of lewd conduct, Jennifer stated that defendant repeatedly molested her, fondling her breasts and genitals and forcing her to touch his penis. If defendant engaged in this conduct, his intent in doing so could not reasonably be disputed. (Cf. *People* v. *Williams* (1992) 4 Cal.4th 354, 362 [14 Cal.Rptr.2d 441, 841 P.2d 961]; cf. also *People* v. *Tassell, supra,* 36 Cal.3d 77, 88, fn. 6 and cases cited therein.) As to these charges, the prejudicial effect of admitting evidence of similar uncharged acts, therefore, would outweigh the probative value of such evidence *to prove intent.*[7]

We need not, and do not, consider whether the evidence of defendant's uncharged misconduct was admissible to establish defendant's intent as to

---

[7]Because we conclude that the disputed evidence was admissible to establish a common design or plan, rather than to prove intent, defendant's offer to stipulate "that if the jury finds that the defendant was present and committed the various acts which are the subject of these

the single charge of annoying or molesting a child, because the evidence was not admitted for that limited purpose and the jury was not instructed to consider the evidence only as to that charge.

### III

 Defendant contends that his uncharged misconduct with Jennifer was inadmissible under the rule stated in *People* v. *Stanley, supra,* 67 Cal.2d 812, which prohibits the admission of "uncorroborated testimony of the prosecuting witness as to noncharged offenses . . . ." (*Id.* at pp. 817-818; see also *People* v. *Scott* (1978) 21 Cal.3d 284, 297 [145 Cal.Rptr. 876, 578 P.2d 123].) The decision in *Stanley,* however, expressly declined "to adopt rigid rules" regarding the admission of such evidence. (*People* v. *Stanley, supra,* 67 Cal.2d 812, 818.) Instead, this court recognized that " 'a balancing process must take place—a weighing of the probative value of the evidence offered against the harm it is likely to cause.' [Citation.]" (*Id.* at p. 818.)

In *Stanley,* the complaining witness testified that the defendant "had committed offenses on four other occasions with [the complaining witness] *and other boys* . . . ." (*People* v. *Stanley, supra,* 67 Cal.2d 812, 819, italics added.) This court noted that testimony of uncharged offenses involving the complaining witness and other children "involves a substantial danger of prejudice to defendant." (*Ibid.*) Accordingly, the court held that the trial court abused its discretion in admitting this uncorroborated evidence.

In so holding, this court observed in *Stanley* "that where the basic issue of the case is the veracity of the prosecuting witness and the defendant as to the commission of the acts charged, the trier of fact is not aided by evidence of other offenses where that evidence is limited to the uncorroborated testimony of the prosecuting witness." (*People* v. *Stanley, supra,* 67 Cal.2d at p. 817.) This observation was based upon the premise that the sole purpose in admitting evidence of uncharged misconduct is to corroborate the testimony of the complaining witness. This premise is incorrect, however. As noted earlier, evidence of uncharged misconduct properly may be admitted to prove any fact material to the prosecution's case. Certainly, uncorroborated testimony by the complaining witness concerning the defendant's uncharged misconduct may have less probative value than testimony that is corroborated or testimony provided by a third party, and the probative value of this evidence must be considered by the trial court in conducting the weighing

---

charges, . . . he did so with the requisite specific *intent* . . ." did not affect the admissibility of the evidence.

process mandated by Evidence Code section 352. There will be circumstances, however, in which the uncorroborated testimony of the complaining witness concerning the defendant's uncharged misconduct will be admissible. The present case is one such example.

Jennifer's account of the first occasion on which defendant molested her was relevant to place the charged offenses in context, by disclosing when defendant's recurring pattern of molesting her began. This evidence was no more inflammatory than Jennifer's testimony regarding the charged offenses, so its additional prejudicial effect was minimal. For the same reason, it was unlikely the jury would return a guilty verdict based upon the uncharged misconduct rather than the charged offenses. Accordingly, the trial court did not abuse its discretion in admitting Jennifer's uncorroborated testimony regarding defendant's uncharged misconduct.

### DISPOSITION

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Kennard, J., Arabian, J., Baxter, J., and Panelli, J.,* concurred.

**MOSK, J.,** Dissenting.—At the outset, I agree with the majority's conclusion that Evidence Code section 1101 is still the law of this state.[1] I dissent, however, from the decision of the majority to overrule *People* v. *Tassell* (1984) 36 Cal.3d 77 [201 Cal.Rptr. 567, 679 P.2d 1] (*Tassell*). In *Tassell, supra*, 36 Cal.3d 77, we undertook a closely reasoned review of the case law, and correctly resolved the question of the admissibility of common scheme or plan evidence under section 1101. I would respect this decision as a matter of stare decisis. I also consider that the Legislature has endorsed the court's holding in *Tassell, supra*, 36 Cal.3d 77, with a minor clarification, and that because of legislative acquiescence, it is inappropriate for this court to reverse itself.

Section 1101 prohibits the introduction of evidence of uncharged crimes to show the defendant's criminal disposition. (*People* v. *Williams* (1988) 44 Cal.3d 883, 904 [245 Cal.Rptr. 336, 751 P.2d 395]; *People* v. *Thompson* (1980) 27 Cal.3d 303, 316 [165 Cal.Rptr. 289, 611 P.2d 883]; *People* v.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

[1]All statutory references are to the Evidence Code unless otherwise indicated.

*Thomas* (1978) 20 Cal.3d 457, 464 [143 Cal.Rptr. 215, 573 P.2d 433]; see also *People* v. *Cramer* (1967) 67 Cal.2d 126, 129 [60 Cal.Rptr. 230, 429 P.2d 582]; *People* v. *Kelley* (1967) 66 Cal.2d 232, 238 [57 Cal.Rptr. 363, 424 P.2d 947]; 1 Witkin, Cal. Evidence (3d ed. 1986) § 356, pp. 325-326.)

Section 1101 provides that "evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion." However, the section does not prohibit "the admission of evidence that a person committed a crime, civil wrong, or other act *when relevant to prove some fact . . . other than his or her disposition to commit such an act.*" (§ 1101, italics added.) The section provides examples of facts that may be relevant for some reason other than disposition: "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ." (*Ibid.*)

The examples that the statute recites of facts that may be relevant for some reason apart from criminal disposition are, with the exception of intent and identity, not normally ultimate facts at issue in a criminal trial. (*People* v. *Thompson, supra,* 27 Cal.3d at p. 315, fn. 13.) They are intermediate facts, admitted because they are relevant to an ultimate issue other than criminal propensity. (*Id.,* at p. 315, fn. 14.) Thus one Court of Appeal observed that "[t]here is a distinction between facts in issue (*facta probanda*) and subordinate facts (*facta probantia*) which tend to prove facts in issue. In classic parlance, plan and scheme are *facta probantia,* not facts in issue. (J. Stone, *Exclusion of Similar Fact Evidence: America,* 51 Harv.L.Rev. 988, 1026n, cited in McCormick on Evidence, p. 328n." (*People* v. *Covert* (1967) 249 Cal.App.2d 81, 84, fn. 1 [57 Cal.Rptr. 220].)

It hardly seems controversial to require, as we did explicitly in *People* v. *Thompson, supra,* 27 Cal.3d 303, that evidence of an uncharged crime must be relevant to some ultimate fact in issue, either directly or through the drawing of an inference. (*Id.,* at p. 315, & fn. 14.) We explained: "Evidence of an uncharged offense is usually sought to be admitted as 'evidence that, if found to be true, proves a fact from which an inference of another fact may be drawn.' [Citation.] As with other types of circumstantial evidence, its admissibility depends upon three principal factors: (1) the materiality of the fact sought to be proved or disproved; (2) the tendency of the uncharged crime to prove or disprove the material fact; and (3) the existence of any rule or policy requiring the exclusion of relevant evidence." (*People* v. *Thompson, supra,* 27 Cal.3d at p. 315, italics & fn. omitted; see also *People* v. *Daniels* (1991) 52 Cal.3d 815, 856 [277 Cal Rptr. 122, 802 P.2d 906]; *People* v. *Gallego* (1990) 52 Cal.3d 115, 171 [276 Cal.Rptr. 679, 802 P.2d

169]; *People* v. *Robbins* (1988) 45 Cal.3d 867, 879 [248 Cal.Rptr. 172, 755 P.2d 355].)

We continued: "In order to satisfy the requirement of *materiality*, the fact sought to be proved may be either an ultimate fact in the proceeding or an intermediate fact 'from which such ultimate fact [] may be presumed or inferred.' [Citation.] Further, the ultimate fact to be proved must be 'actually in dispute.' " (*People* v. *Thompson*, *supra*, 27 Cal.3d at p. 315, fns. omitted.)

Accordingly, even before our decision in *Tassell*, *supra*, 36 Cal.3d 77, we were concerned to limit evidence of uncharged crimes to situations in which such evidence was actually relevant to a fact in issue.

It was on the basis of this understanding that we reached the conclusion in *Tassell*, *supra*, 36 Cal.3d 77, that evidence of an uncharged crime showing a common scheme or plan was not admissible unless it was material in the sense that it was relevant to prove some disputed ultimate fact. We reviewed the case law interpreting section 1101, and arrived at the conclusion that in order to avoid permitting evidence of uncharged crimes to be admitted to show criminal disposition, the "plan" language of section 1101 must be interpreted to require that the evidence show essentially a conspiracy of which the charged offense formed a part, or that such evidence of a common plan must be relevant to prove some matter actually at issue, such as identity or intent. (36 Cal.3d at pp. 88-89.)

Although the majority would overrule *Tassell*, *supra*, 36 Cal.3d 77, they endorse the view that evidence of common scheme or plan should not be admitted as an end in itself or to show criminal propensity. They conclude that a common scheme or plan is an intermediate fact from which can be drawn an inference on an ultimate fact in issue, that is, that defendant did commit the charged crime. (See maj. opn., *ante*, pp. 393-394 & fn. 2, and pp. 399, 403.) They err, however, in concluding that evidence of common plan in this case was relevant apart from its tendency to show the defendant committed the charged crime because he acted in conformity with his criminal disposition.

How does evidence of a common plan legitimately show that defendant committed the crime? As the majority assert, a common plan must demonstrate " 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (See

maj. opn., *ante*, p. 402.) This definition seems to me consistent with that stated in *Tassell, supra*, 36 Cal.3d 77; when the evidence shows an overarching plan or conspiracy, such that if it is established defendant committed the uncharged portion he probably committed the charged portion as well, evidence of the plan is relevant to show that defendant committed the charged crime.

In the foregoing situation, the evidence is like a jigsaw puzzle, in which the shape of the missing piece can be inferred from examining the pieces around it. I would agree that such evidence of common scheme or plan is admissible to show that the defendant committed the charged crime.

In addition, when the evidence of a common scheme or plan is simply that defendant has committed the same kind of crime at an earlier date, it may be admissible in the same way that modus operandi evidence is admissible on the issue of identity or intent. We said no differently in *Tassell, supra*, 36 Cal.3d 77, 88-89.

However, neither of these grounds for admission of the prior uncharged crimes was present here. Here, the evidence of uncharged crimes showed that defendant had molested his older stepdaughter some years before he committed the charged crimes of molesting his younger stepdaughter. There was no overarching plan of which the charged crimes were simply one manifestation, nor was there any issue of intent or identity.

When there is no issue of identity or intent, and the evidence does not reveal a grand design of which the charged and uncharged crimes are parts, in what way is evidence of a prior uncharged crime of the same nature as the charged crime probative on the ultimate issue of whether defendant committed the charged crime? I submit that it is probative only if we permit the jury to draw the inference from the earlier crime that it is defendant's inclination or nature to commit such crimes, and that this aspect of his character caused him to commit the charged crimes. This is nothing but criminal propensity evidence, and should be excluded by section 1101. The majority, in concluding that such evidence is admissible, fail to carry out the basic purpose of section 1101, which is to prohibit the introduction of other crimes evidence to show criminal disposition.

Fundamentally, disapproving *Tassell,* a case that has guided courts for a decade, does violence to the principle of stare decisis.[2] This kind of calculated damage to an elementary principle is disturbing. Retired Justice Lewis Powell recently wrote on the importance of stare decisis. The doctrine is, he emphasized, "essential to the rule of law." (Powell, *Stare Decisis and Judicial Restraint* (1991) J.Sup.Ct.Hist., p. 15.)

Justice Powell reduced the merits of stare decisis to three simple specifics:

"(i) The first is one of special interest to judges: it makes our work easier . . . . It cannot be suggested seriously that every case brought to the Court should require reexamination on the merits of every relevant precedent.

"(ii) *Stare decisis* also enhances stability in the law. . . . [S]*tare decisis* is necessary to have a predictable set of rules on which citizens may rely in shaping their behavior.

"(iii) Perhaps the most important and familiar argument for *stare decisis* is one of public legitimacy. . . . An important aspect of this is the respect that the Court shows for its own previous opinions." (Powell, *Stare Decisis and Judicial Restraint, supra,* J.Sup.Ct.Hist., pp. 15-17.)

Rejection of stare decisis by a majority of this court has been much too frequent. See, e.g., *People* v. *King* (1993) 5 Cal.4th 59, 82-83 [19 Cal.Rptr.2d 233, 851 P.2d 27] (conc. and dis. opn. of Mosk, J.); *Rider* v. *County of San Diego* (1991) 1 Cal.4th 1, 33 [2 Cal.Rptr.2d 490, 820 P.2d 1000] (dis. opn. of Mosk, J.); *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1264 [275 Cal.Rptr. 729, 800 P.2d 1159] (conc. and dis. opn. of Mosk, J.); *Mitchell* v. *Superior Court* (1989) 49 Cal.3d 1230, 1257 [265 Cal.Rptr. 144, 783 P.2d 731] (conc. opn. of Mosk, J.); *Hernandez* v. *Municipal Court* (1989) 49 Cal. 3d 713, 729 [263 Cal.Rptr. 513, 781 P.2d 547] (dis. opn. of Mosk, J.); *Thing* v. *LaChusa* (1989) 48 Cal.3d 644, 681 [257 Cal.Rptr. 865, 771 P.2d 814] (dis. opn. of Mosk, J.). I will not belabor the point, except to add that the court's failure to adhere to this doctrine, particularly in the criminal law, has put the law into flux and deprived our current pronouncements of the echo of finality.

Finally, we should not overlook the fact that the Legislature, in amending and reenacting section 1101 in 1986, specifically referred to *Tassell, supra,*

---

[2]Vainly attempting to rationalize their damage to stare decisis, the majority, in footnote 5 of their opinion, declare that a subsequent opinion—i.e., *People* v. *Ruiz* (1988) 44 Cal.3d 589 [244 Cal.Rptr. 200, 749 P.2d 854]—is in effect "at odds" with *Tassell, supra,* 36 Cal.3d 77. To the contrary, *People* v. *Ruiz, supra,* 44 Cal.3d 589, did not criticize *Tassell, supra,* 36 Cal.3d 77, and in fact cited that opinion with approval at page 605.

36 Cal.3d 77, and expressed the intent to clarify it on the question of when intent is put in issue. The Legislature stated: "It is the intent of the Legislature in enacting this act to clarify the holding in People v. Tassell, 36 Cal.3d 77, to the extent an inference can be drawn from that holding that evidence of another act is ipso facto inadmissible or irrelevant to the issue of a defendant's reasonable and good faith belief that the victim consented, by rejecting that inference and making it clear that evidence can be relevant on that issue [of intent] in a particular case, depending upon the circumstances there present." (Stats. 1986, ch. 1432, § 2, p. 5130.)

As the defendant argues, if the Legislature meant to clarify *Tassell, supra,* 36 Cal.3d 77, on one point, it follows that the Legislature accepted it on its other points. (See *People* v. *Scott* (1987) 194 Cal.App.3d 550, 556 [239 Cal.Rptr. 588].) Under the doctrine of legislative acquiescence, then, our decision in *Tassell, supra,* 36 Cal.3d 77, has been adopted by the Legislature and should not be overruled by this court. (See *Fontana Unified School Dist.* v. *Burman* (1988) 45 Cal.3d 208, 219 [246 Cal.Rptr. 733, 753 P.2d 689].)

I would affirm the judgment of the Court of Appeal.