Filed 6/27/13  P. v. Morales CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>GERMAN MORALES,<br><br>　　　　Defendant and Appellant. | A132806<br><br>(Alameda County<br>Super. Ct. No. H47110) |

A jury convicted defendant German Morales of two counts of workers' compensation insurance fraud under the Insurance Code, as well as attempted perjury and insurance fraud under provisions of the Penal Code, arising from a workers' compensation insurance claim he filed against a former employer in 2007.  Defendant contends (1) the evidence was insufficient to support his conviction for insurance fraud under the Penal Code; and (2) the trial court erred in admitting evidence under Evidence Code section 1101, subdivision (b) of a second workers' compensation insurance claim he brought against a different employer alleging a different injury.  We affirm the judgment.

## I.  BACKGROUND

Defendant was charged by amended information with three counts of workers' compensation insurance fraud (Ins. Code, § 1871.4, subd. (a)(1); counts one, three, four); attempted perjury (Pen. Code, §118; count two); and insurance fraud (Pen. Code, § 550, subd. (b)(3); count five).

Count one alleged defendant made false and fraudulent representations in the workers' compensation claim he filed on January 22, 2007, pertaining to Weber Distribution (Weber). Counts two and three, respectively, allege attempted perjury and workers' compensation insurance fraud, arising from false statements defendant made in the course of his June 5, 2007 deposition in the workers' compensation matter. Count four alleges false and fraudulent representations for the purpose of obtaining compensation made in connection with his qualified medical exam on June 6, 2007. Count five alleges knowing concealment and failure to disclose the occurrence of an event or events affecting his entitlement to an insurance benefit (or benefit amount) in his medical exam on June 6, 2007.

Defendant pleaded not guilty to all counts. Jury trial commenced on May 17, 2011.

**A. *Prosecution Case***

**1. *2003 Knee Injury***

On September 6, 2005, Dr. John Welborn, Jr., an expert in orthopedic medicine, conducted a qualified medical examination (QME) of defendant and prepared a report for purposes of determining if defendant qualified for workers' compensation. Dr. Welborn testified defendant provided the following information: On November 2, 2003, while working as a truck driver for Checkmate Transport (Checkmate), which lent him out to Penske Logistics (Penske) that day, defendant injured his right knee by pulling a heavy pallet with a machine. This resulted in pain and locking and giving way of his right knee. He also suffered a hernia in his right groin and broke his right index finger the same day. On June 30, 2004, Dr. Rajagopalan performed a minimally invasive arthroscopic surgery procedure, which allowed him to look inside and repair cartilage in the right knee joint, but the surgery did not alleviate defendant's knee problems. Defendant took Vicodin for his right knee pain and needed to use a cane at all times because his knee was unstable.

Dr. Welborn examined defendant's right knee in September 2005, and found swelling, pain when partially flexed, and tenderness. He reviewed the surgeon's report of his consultation with defendant preceding surgery, the surgeon's operative report

2

describing the damaged knee, and an MRI conducted in November 2003. Dr. Welborn determined defendant had arthritis in his right knee and a partial tear of his ACL. He considered these an age-related arthritis or degeneration of the knee, rather than an "injury" in the ordinary sense. However, for workers' compensation purposes, Dr. Welborn opined defendant's right knee injury that led to his disability arose out of his employment.

Under the prevailing rules at the time, Dr. Welborn did not apportion any part of defendant's disability to his preexisting arthritis. Based on defendant's description of his continued pain and mechanical symptoms, Dr. Welborn opined the injury was not permanent and stationary and defendant needed future medical care, such as seeing an orthopedic surgeon every three months and getting Cortisone injections and anti-inflammatory drugs for his severe knee pain. Dr. Welborn opined defendant would probably need retraining in the future because of his chronic severe knee pain, and could not return to his job as a truck driver that usually involved some heavy lifting and loading and unloading.

In October 2005, defendant compromised and settled his workers' compensation claim against Checkmate, including any future medical expenses for his injuries, for a lump sum payment of $70,000.

### 2. *2006 Employment with R & A Trucking Company*

R & A Trucking Company (R&A), moved products from shippers and distributed them throughout Northern California. R&A had a well-established policy regarding workers' compensation claims. The policy required that when an employee reported an injury, the manager first determined if immediate attention was needed, such as calling 911 or going to the hospital. The manager was required to fill out and submit a "DWC 1" form to the State Compensation Insurance Fund, the workers' compensation insurance company. In 2006, R&A had 17 drivers.

In early February 2006, operations manager Benjamin David Soleimanieh, hired defendant as a driver. Defendant did not tell Soleimanieh he had any preexisting right knee or shoulder injuries. Defendant drove steel coils from R&A's Oakland facility to

New United Motor Manufacturing, Inc. At the Oakland facility, workers loaded the coils by crane or forklift into the back of the truck trailers. The drivers secured the rolls of coil onto the trailers using binders and chains. The drivers threaded the chains through the inside diameter of the rolls of coil and secured them with binders, a device with a hook on each end, onto opposite sides of the truck's trailer. One side was fixed and the other side was tightened using a ratcheting mechanism with a three-foot-long bar for leverage to turn the "binders" until the chain was tight and the binder "snaps" or "clicks" to lock and secure the load onto the trailer. The drivers hauled four to five loads a day. Soleimanieh saw and talked to defendant in person about five times daily. They also communicated on Nextel radio 4 to 12 times a day. Defendant worked for R&A for two weeks. He was a new driver in training and rode with an experienced driver until the last day. Defendant was trained to use both arms to place the bar inside the binder and use his weight plus gravity to snap and lock the binder "with ease." Soleimanieh watched defendant use the binders and defendant did not complain or show any pain or injury in his right knee or shoulder.

On February 14, 2006, defendant was involved in a vehicle collision and R&A terminated him. Defendant never reported to R&A that he injured himself.

### 3. *2006 Employment with Weber*

Weber was a warehousing, distribution, and trucking company with multiple warehouse distribution centers, including one in San Leandro. Every employee, when hired, received Weber's policy and procedures manual and was required to sign and return an acknowledgement form that was filed with the human resources department at headquarters. The manual required employees to report injuries immediately to their manager. An employee or the manager also was required to report any cumulative trauma, that is an injury that occurred over a period of time, as soon as he or she understood there might be an injury.

In 2006, Greg Berg was direct supervisor of the warehouse facility in San Leandro. About February 16, 2006, Berg interviewed and hired defendant. Defendant did not tell Berg he had any shoulder or right knee injury, or needed special

4

accommodations to do his job. Nor did Berg notice defendant had any injuries or disabilities. Defendant drove a tractor-trailer for about four months. Defendant made about three to six deliveries a day, generally of totes, pallets of drums, or pallets of pails, up to 3,000 pounds. The trucks were loaded by warehouse workers. The trucks were unloaded either by workers at the delivery site or by the driver using a hand pallet jack, which looks like a small forklift with a hydraulic lift. The lift is raised by a pump and can move up to 5,000 pounds.

Berg had contact with defendant two to three times daily. Once, defendant asked for an electric pallet jack saying the totes were heavy. Berg had one electric jack, but it was broken, and told defendant he had none available. Defendant never expressed any physical symptoms or injuries from using the manual pallet jack or that he was unable to do his job. Defendant never told Berg, as defendant claimed, "[I]f you don't get me an electric pallet jack, I might have to get an MRI." Berg testified using a manual pallet jack was "pretty easy."

On June 15, 2006, defendant left Weber, telling Berg he was moving to Arkansas where his kids and ex-wife lived. Defendant did not mention he had difficulty performing his job or he injured himself, nor did Berg notice any injuries.

**4.** *Defendant's 2007 Workers' Compensation Claim*

On January 22, 2007, defendant filed a workers' compensation claim. On January 31, 2007, Pauline Nolan, human resources supervisor at Weber, received notice by mail that defendant had claimed he was injured while working at Weber. Ms. Nolan immediately checked the log for employee injuries. There was no record that defendant or Greg Berg submitted an injury report for defendant. There also was no record that a DWC 1 form was filed for defendant to report he was injured or was unable to perform his work. Ms. Nolan contacted Berg who had no recollection of defendant reporting any injury.

On February 6, 2007, Ann Hirsch, a claims adjuster for American Commercial Claims Administrators, Inc. (ACCA), Weber's insurance company, received a "Declaration of Readiness to Proceed" form that had been filed with the State of

5

California Workers' Compensation Appeals Board on January 22, 2007. Ms. Hirsch delayed decision on defendant's claim pending further investigation because of inadequate information on which to base a decision. She had not received a notice of the claim filed by the injured worker, or a report submitted by the injured worker or employer to the insurance carrier, or medical information detailing the basis for the claim. On March 2, 2007, Ms. Hirsch denied the claim.

In March 2007, the first workers' compensation hearing for defendant's case was held. Present were attorneys Angelique Scott, representing ACCA for Weber, and John Stanwyck, representing the State Compensation Insurance Fund for a separate claim against R&A, and the administrative law judge. Defendant was present using crutches.

### 5. *Private Investigation Evidence*

On March 23, 2007, Ms. Hirsch and investigator Jenna Conner referred the case to the special investigations unit of ACCA to determine if the injury arose out of or in the course and scope of employment. A private investigation company was hired.

Beginning about March 27, 2007, private investigator Suzanne Reed surveilled defendant for 11 days in Arkansas, where he lived, using a video recorder. Excerpts of Reed's video, along with her testimony, showed the following:

On Wednesday, March 28, 2007, a minivan registered to defendant left his apartment complex at 205 Linden Street in Cabot, Arkansas. Defendant rode in the passenger seat to Little Rock Airport.

On Friday, April 6, 2007, at 9:06 a.m., defendant walked from his van to his apartment. At 9:09 a.m., defendant, with a young boy, walked to the van, and defendant drove to Knight's Grocery Store. At 9:14 a.m., he and the young boy walked into the grocery store and defendant pushed a shopping cart through the store. He did not limp or use any assistive device to help him walk or shop. At 9:23 a.m., defendant and the young boy walked out of the store. Defendant carried a grocery bag in his right hand, switched the bag to his left hand, and unlocked the van door with his right hand. Defendant drove back to the apartment. At 1:30 p.m., defendant left his apartment. He drove a motorcycle to another apartment complex, arriving at 1:35 p.m. Defendant walked

toward an apartment. At 1:41 p.m., defendant walked back out and rode his motorcycle to Kentucky Fried Chicken and walked inside at 1:48 p.m. At 1:53 p.m., defendant rode his motorcycle back home. He walked to his apartment, spoke to a female on the patio who appeared to be his wife, kissed her, and walked inside.

On Saturday, April 7, 2007, at 2:34 p.m., defendant and his family were in the backyard. Defendant played soccer with his son for at least 10 minutes, walked around, threw a plastic tarp over some exercise equipment, and went inside.

On Sunday morning, April 8, 2007, defendant drove a short distance to church, arriving at 10:15 a.m. Defendant walked inside and at 11:36 a.m., he drove back home, then drove to a gas station, through the car wash, and left at 12:03 p.m. At 12:20 p.m., he drove to the Golden Corral restaurant in Little Rock and dropped off his family at the front door. He found a parking space and walked across the parking lot to the restaurant. At 1:55 p.m., defendant and his family left the restaurant and walked across the lot to the car and drove away. Defendant did not use crutches or have difficulty walking. At 2:04 p.m., the van traveled to the movie theater. Defendant stepped out of the van, walked to the ticket window, bought tickets, and walked back to the van. The family went into the theatre. At 6:32 p.m., they drove back to their apartment, arriving at 6:59 p.m.

On Thursday, May 24, 2007, at 10:57 a.m., defendant walked out of his apartment and toward the mailbox.

On Friday, May 25, 2007, at 8:14 a.m., defendant drove the van to Knight's Grocery Store. At 8:27 a.m., defendant left the store pulling a shopping cart. He moved a few grocery bags from the cart into his van, returned the cart to the return area, walked back to his van, and drove back to his apartment, arriving at 8:34 a.m. That same day, at 9:03 a.m., defendant walked from his apartment to his van, put items in the rear of the van, and drove away. At 9:35 a.m., he drove into a parking garage at University of Arkansas for Medical Sciences in downtown Little Rock. At 12:20 p.m., defendant drove out of the garage.

On Saturday, May 26, 2007, at 10:37 a.m., defendant walked to his van and then back to his apartment carrying crutches. At 10:43 a.m., he drove to a strip mall in Cabot,

7

stayed inside his van, and then drove to a self-storage facility also in Cabot. Defendant carried items from his van into the storage unit and moved items from the storage unit into his van. Defendant reached out and pulled down the door of the storage unit. He next reached up and closed the back door of the van. He drove back to his apartment, arriving at 11:24 a.m. After 12:50 p.m., defendant drove his Mercedes to the same strip mall he went to earlier. Defendant stepped out of the car and walked inside a newspaper business. Defendant walked back to his car and drove back to his apartment, arriving at 2:00 p.m.

On Sunday, May 27, 2007, at 8:53 a.m., defendant was on the patio behind his apartment. At 2:30 p.m., defendant left in his Mercedes and traveled to a Dollar General store in Cabot. A woman stepped out, went inside the store, returned to the front passenger seat and the Mercedes departed. At 3:04 p.m., defendant, a woman, and a young boy stepped out of the car at Pinnacle Point Hospital in Little Rock. They walked toward the entrance of the building. At 4:23 p.m., they walked back to the car and left. At 4:30 p.m., defendant, the woman, and young boy walked inside Corrina's Restaurant. At 5:25 p.m., defendant walked to the car, put a bag in the back seat, and drove his family away. At 6:00 p.m., defendant's car was in the Sam's Club parking lot in Jacksonville, Arkansas. At 6:19 p.m., defendant and the young boy walked from the store to the car, and defendant drove back to the apartment, arriving at 6:45 p.m. At 6:45 p.m., defendant carried items from his car to the apartment, unlocked the door, and walked inside.

### 6. *Defendant's Deposition*

On June 5, 2007, defendant was deposed. Present were attorney Angelique Scott, representing ACCA for Weber, attorney John Stanwyck, representing the State Compensation Insurance Fund for R&A, and the court reporter. Defendant was present using crutches. Defendant's statements were taken under oath. At the time of the deposition, defendant had no health insurance and his last employment was with Weber, which he left on June 16, 2006. Defendant testified he filed workers' compensation claims against his ex-employers R&A and Weber. Three years before, he filed a claim against his then-employer, Checkmate, where he was a driver for about a year.

8

Defendant stated at Checkmate, he injured his right knee and fractured his right index finger. He was treated at the occupational clinic in San Leandro by Dr. Chang, Dr. Vogal, and Dr. Rajagopalan; the latter performed surgery on his knee. Subsequently, defendant signed a compromise and release and was given a lump sum settlement for his injury, closing out his right to compensation for future medical care.

Defendant testified he sustained an injury when working for R&A for two weeks. He reported on the workers' compensation form that the injury occurred on February 13, 2006, the day before he was terminated. He explained his injury was an "ongoing thing . . . . because I have to be holding these binders all day long." Defendant claimed he told his supervisor at R&A that he hurt himself using the binders. Defendant did not ask for a claim form because he wanted to keep trying to work to earn a living.

Defendant claimed that after February 2006, he could lift "[v]ery little." He was able to work for Weber and "pull tens of thousands of pounds everyday" because he used a different set of muscles than he used working for R&A. After a while though, his shoulder hurt. With respect to his claim against Weber, defendant reported on the workers' compensation form he was injured on May 11, 2006, because "it was more or less the date that [he] mentioned to one of the managers that if [the manager] didn't get [him] a pallet jack, an electrical pallet jack, [he] might have to have MRI's done." Defendant believed the manager's name was "Mick," and that he was "there for a short time."[1]

Defendant stated that although the pain in his right knee ceased about a year after Dr. Rajagopalan performed surgery in 2004, the symptoms in his right knee reoccurred on May 11, 2006, while working for Weber. He also noticed additional symptoms of injury to his left knee, left elbow, and shoulder. At the end of May, defendant reported to "some administration lady" at Weber that he injured himself pulling heavy merchandise with the pallet jack. The woman did not have defendant fill out a form regarding his

---

[1] Berg testified he had an employee by the name of "Mick," but could not recall his last name. Mick was a driver, not a supervisor. Neither Mick, nor anybody else, ever reported to Berg that defendant injured himself.

injury.  Defendant hoped she would tell his manager Greg Berg.  Defendant also testified he did not receive any medical treatment or tell his Weber employers about the injuries he received while working there because, "They didn't give me a chance.  They didn't want to know."

About a year later, at the time of this deposition, defendant's left knee was about the same and the right knee worsened.  Defendant explained, "My cartilage is pretty much destroyed that I can feel [*sic*], and my ligaments are lacking in my kneecap, and arthritis is setting in."

Defendant testified he cannot raise his arm or lift anything; he cannot lift his right arm to waist level without pain; he cannot move his right arm further than one inch away from his body without "[v]ery much" pain; walking, taking a few steps, "[d]efinitely" aggravates both his knees and he "hardly walk[s]"; and he cannot put any weight on his knee.  Defendant claimed he started to use crutches right after his May 2006 injury, but does not always have to use them.  When he is in the house, he could "grab things" on his way to the restroom, however, he felt pain afterwards.  When he leaves the house, he used the crutches "[v]ery much."

Defendant testified that he has not participated in sports activities since February 2006, even with friends or family.  He does not spend time engaging in outdoor activities or playing games with his six-year-old son.  He can bend 90 degrees, but not all the way to the ground; he cannot stretch his left arm, but can raise it above his shoulder; he cannot raise his right arm above his shoulder;  he cannot run or pivot on one foot; Defendant claimed he "[v]ery seldom" drives his 300-pound motorcycle; maybe "[o]nce in six months."

Ms. Scott believed defendant's statements regarding his ability to run, use of crutches, and participating in sports with his family were false, since they were inconsistent with his physical activities shown on the surveillance video.

### 7.  *QME by Dr. Branscum*

Meanwhile, on May 17, 2007, Ms. Scott, the attorney for ACCA, sent Dr. John Branscum a medical cover letter summarizing the medical records and legal documents

10

enclosed. Dr. Branscum practiced orthopedic medicine for 50 years and was an expert in his field. Ms. Scott asked Branscum to address whether any of defendant's alleged injuries arose out of employment or during the course of employment. On June 6, 2007, Branscum conducted a QME of defendant for injuries he allegedly received while working at Weber and R&A, and prepared separate reports for each company.

### a. Weber Report

Dr. Branscum testified that on the intake form which defendant filled out before the examination, defendant reported that his knees and elbow pain rendered him unable to work, lift, or walk. Branscum reviewed MRI reports for defendant conducted in 2006 at the University of Arkansas for Medical Sciences. The MRI of the right knee showed "a complex tear" of the cartilage, and suspicion of a small displaced fragment. The MRI also showed a "[g]rade IV chondromalacia" (large cartilage damage) and a loose body or torn cartilage between the knee joint. A 2006 MRI of the left elbow from the University of Arkansas showed no significant finding. Defendant reported he received settlements in March 2003 for an industrial back injury, and another settlement in 2005. In response to whether he had any other serious accidents, injury or illness, defendant answered, "[Y]es. [¶] . . . A knee accident," and that he received a permanent disability settlement on October 13, 2005.

Branscum reported defendant presented himself at the examination using crutches, sat through the interview with no acute distress, got up from his seat with great effort, and claimed he could not walk heel-toe or squat because of his right knee pain. Branscum examined defendant's left elbow. Branscum found no effusion (outpouring of fluid in a joint), erythema (redness), or masses. Defendant could not flex his elbow to touch his shoulder due to pain and defendant's elbow strength was greatly reduced. Branscum reported that "[e]xamination of the left elbow reveals tenderness . . . to even the very lightest touch, I can deliver with the tip of my finger." Branscum testified that based on his observation and the MRI, defendant's reaction was "a false response."

Branscum examined defendant's right knee. He found no malalignment (crookedness), erythema, effusions, or masses. Full flexion of the right knee was painful.

11

Branscum reported, "Ligament testing cannot be performed effectively because the patient's knee so painful." Branscum explained defendant barely allowed him to tap his right knee very lightly with one finger. Defendant pushed Branscum away "[c]laim[ing] that his [right] knee is too painful to allow me to test for the ligaments." "[O]bviously [¶] . . . [t]here's no disease process that would have caused the amount of tenderness that which Mr. Morales' [*sic*] was complaining. Even an acutely [a]ffect[ed] knee would not be that tender." Branscum testified he saw no infection or inflammation of the right knee. Branscum found arthritis in the right knee and a complex degenerating tear in the medial meniscus.

Branscum reported defendant was "[on] crutches even thou[gh] he has a right shoulder pain, and he exhibits an unusual amount of symptom magnification." He determined he did not have any significant credible evidence as to what physical activities actually caused the right knee injury. Branscum did not believe that using a manual or electric pallet jack could cause the injuries. Branscum examined the left knee and found no malalignment, erythema, effusion, masses, or tenderness. Defendant complained of pain on full flexion. Ligament testing showed the knee ligaments were stable. "Examination of the left knee [was] unremarkable." Branscum noted defendant was not using his two crutches in a manner consistent with a right shoulder injury, a shoulder tear, and injured knees, but was supporting his weight with his legs.

In his report, Branscum expressed suspicion of defendant's complaints and had a "problem with his veracity." Branscum had "a great deal [of] difficulty determining whether [defendant's] right knee and left elbow injuries" are job-related. Branscum testified that based on the limited records available, including the MRI, there was no indication a right knee replacement was needed. Branscum wrote: "[I] [c]annot say with any degree of medical certainty that the patient's injuries were caused by his work activities. He certainly does have some pathology [disease] in the right knee, but in my opinion, it was highly unlikely that the injuries which he described resulting in the finding of the MRIs [*sic*]. Decision will ultimately have to be made with the trier of fact. I cannot make that decision based on the fact of the veracity and inaccuracy of the

12

patient's history. And in addition, Mr. Morales exhibits significant amount of pain magnification."

Dr. Branscum concluded defendant's disability status was "permanent and stationary," meaning he reached a plateau and was not likely to improve or deteriorate in the near future. Branscum opined, "There's [*sic*] no work restrictions to the right elbow and the left knee. Right knee has a disability clinic prolonged weight [bearing] greater than 50 percent of the time and heavy lifting. He is limited to semi-sedentary work." Branscum determined defendant's injury resulted in an 8 percent impairment of defendant as a whole person.

Despite his doubts about defendant's veracity, Dr. Branscum apportioned 50 percent of defendant's right knee injury to working at Weber and 50 percent to nonindustrial reasons. Branscum arrived at this apportionment by *assuming* everything defendant said was true, including that his injury occurred at Weber, the injury was caused by use of pallet jacks, and his complaints of pain in the knee were genuine and prevented him from submitting to the hands-on examination of his knee Dr. Branscum attempted to perform.

### b.  R&A Report

Dr. Branscum stated he did not have enough credible evidence to say with any degree of medical certainty that defendant's right shoulder and right knee condition were caused by injuries alleged to have occurred during defendant's employment by R&A. He stated:  "Patient gives a history of developing pain in the right shoulder when he was forced to work in an unusual fast pace, folding chains and binders. He did not report one specific incident which brought on the pain, so I cannot say with any degree of medical certainty that the right shoulder rotator cuff tear was caused by the folding chains and binders. . . . This is not the way in which a rotator cuff tear usually occurs."

### c.  Supplemental Report

On September 14, 2007, Dr. Branscum prepared a supplemental report based on material reviewed after his initial report, including surveillance tapes, defendant's deposition, and medical records pertaining to defendant's 2004 knee surgery. He noted

13

his original impressions that defendant "exhibited [a] significant amount of illness, behavior, and symptom magnification," and his "history was not trustworthy." Whereas defendant appeared in his office on two crutches and had a difficult time ambulating, on the DVD's he observed defendant carrying the crutches in his left hand and walking in a perfectly normal fashion with no evidence of a limp, and was "quite impressed with his ability to walk and run both forward, backward, and sideways[,] and kick the ball with the right leg." Although the MRI and report by his surgeon showed defendant had a significant right knee condition, Branscum concluded he was capable of returning to work as a truck driver as long as he was not required to do very heavy lifting. Branscum rescinded his prior apportionment evaluation and concluded, "The majority of the injuries have been from a cumulative trauma, and I do not feel capable of apportionment between his different employers."

**B.** *Defense Case*

Dr. Richard Nolan, an orthopedic surgeon, testified as a defense expert witness. Dr. Nolan interviewed and examined defendant on February 3, 2011, and reviewed his medical records and MRI's, as well as the depositions of defendant and Dr. Branscum. Nolan found defendant had an effusion, which he described as water on his right knee, and moderate kneecap "popping" with moderate crepitation (grinding) in that knee. Nolan found tenderness to defendant's left knee, right shoulder, and left elbow. Nolan concluded defendant had suffered an injury to his right knee in 2003, experienced some improvement after surgery in June 2004, and then in 2006, reinjured his right knee in the same area as his first injury, which aggravated his preexisting problem. Nolan opined defendant "reasonably could have" (1) injured his right shoulder while working at R&A; and (2) aggravated the injury to his right knee, as well as sustained the slight injury to his left elbow, while working at Weber.

Nolan further opined that defendant's activities shown on the surveillance videotapes were not inconsistent with his injuries. He noted the video of defendant playing soccer with his children showed defendant had wrapped his knee and limped throughout the video. Nolan found it significant defendant kicked only with his right leg,

14

which indicated the right knee was unstable and would not support him if he tried to make a left-footed kick. Nolan believed defendant was able to walk without crutches in Arkansas, but needed the crutches when he flew to California because the two long plane flights required would have made the knee stiffer and more painful to walk on.

Defendant testified on his own behalf. He described the November 2003 incident when he was employed by Checkmate in which he injured himself trying to regain control of a pallet jack holding a pallet loaded with merchandise. Eventually, he was told he needed surgery on his knee and filed a workers' compensation claim against Checkmate and Penske, the company Checkmate had assigned him to work for on the date of his injury. Defendant testified he felt he was getting better, but when he saw Dr. Welborn he had suffered a flare-up and was in pain.

In February 2006, defendant felt better so he applied for a job at R&A. He left after two weeks because of a dispute with the company and because he felt a pain in his arm. He did not file an injury report before he left. He later told Dr. Nolan he left because of his shoulder injury. Right after leaving R&A, he applied for a truck driver job with Weber. He believed he could do the job because there were no binder chains to tighten as the job did not involve driving a flatbed truck. He went for a medical examination when he applied for the job at Weber and filled out a medical questionnaire. He did not check boxes about previous injuries because the questions were very general. He told the doctor about his knee operation.

At Weber he made up to 10 deliveries a day and had to use a manual pallet jack to move the heavy merchandise he was delivering. He felt okay at first but the loads started getting heavier and he began feeling pain in both knees. He told his supervisor, "Nick," if he could not get an electrical pallet jack, he would have to get an MRI done. "Nick" told him the electrical pallet jack was broken. At some point he told "the administrative lady" he had been injured while delivering a load to the Max Media Company, hoping she would tell Mr. Berg, the general manager. Eventually defendant told Berg he was leaving Weber to go back to his family in Arkansas. There his injuries did not improve so he went for medical treatment to the University of Arkansas, where MRI's were

15

performed on his knees, right shoulder, and left elbow. After receiving the results of the MRI's, defendant filed workers' compensation claims on September 1, 2006.

Defendant explained his allegedly perjurious deposition testimony as follows: When he stated he used crutches "very much," he meant he used crutches every time his knee locked, which was often. When asked if he participated in sports activities with his family, he thought the question referred to activities like playing doubles tennis or going to a sports field to play against other families. When he was asked about playing sports, he thought the question referred to professional sports or least formal sports games. When asked about running, he thought the question referred to running track or running laps. He thought the questions about lifting referred to lifting heavy objects, not everyday items of 10 pounds or less.

He did not use his crutches when he got to the Little Rock airport because he was late and had ordered a wheelchair to use inside the airport. He was able to use the motorcycle because it had an automatic ignition and did not need to be kick-started. He took a Vicodin before he played soccer with his son and felt pain during the game.

When he filled out the questionnaire for Dr. Branscum his condition had worsened. He indicated he could not work, lift, or walk, because he did not think the questions referred to survival activities, and there would be times when he could not walk because his knee would lock.

He filed his workers' compensation claim because he was injured, not to defraud the workers' compensation system.

## C. *Verdict, Sentencing, and Appeal*

The jury found defendant not guilty as to count one, and guilty of counts two through five. The trial court suspended sentence and placed defendant on five years' probation with a condition he serve the first 180 days in jail. Defendant timely appealed from the judgment.

## II.  DISCUSSION

Defendant contends (1) the evidence was insufficient to support his conviction for insurance fraud as alleged in count five of the information; and (2) the trial court erred in

allowing evidence of the R&A workers' compensation claim to be admitted under Evidence Code section 1101, subdivision (b).

## A. *Insurance Fraud Conviction*

Defendant maintains no rational trier of fact could have found "the essential element [of count five] that [he] failed to disclose an event to Doctor Branscum that affected his right to a workers' compensation award."

Faced with a challenge to the sufficiency of the evidence, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)  In so doing, we presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence, including reasonable inferences based on the evidence and excluding inferences based on speculation or conjecture.  (*People v. Tran* (1996) 47 Cal.App.4th 759, 771–772.)

In order to prove defendant made a fraudulent claim or statement under Penal Code section 550, subdivision (b)(3), the prosecution must prove he "[c]onceal[ed], or knowingly fail[ed] to disclose the occurrence of, an event that affects [his] initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which [he] is entitled."  To violate this subdivision, he must have knowingly concealed or failed to disclose the event, intending to obtain benefits to which he would not be entitled if he had made the disclosure.  (*People v. Blick* (2007) 153 Cal.App.4th 759, 772.)

In closing argument, the prosecution asserted in connection with count five that defendant concealed or knowingly failed to disclose his ability to ambulate without crutches, and pretended to experience intolerable and medically inexplicable pain when the doctor lightly touched or tapped his right knee.  Defendant argues on appeal that even assuming his use of crutches on the day of the exam was unnecessary and he exaggerated

17

the tenderness in his right knee, neither of these circumstances constitutes a "prior event" he failed to disclose to Branscum.

In our view, the evidence is sufficient to show defendant's nondisclosure of an event or events affecting his entitlement to benefits. Excerpts from Dr. Branscum's supplemental report, which he prepared after viewing the surveillance tapes, were read to the jury. The report stated in relevant part as follows: "At the time of the evaluation, he presented in my office on two crutches and had a very difficult time ambulating to point A to point B on the crutches. I questioned the patient on the day I examined him because my examination of his left knee was basically unremarkable, and I saw no reason why he would need two crutches. . . . [¶] . . . [¶] The two DVD's, which I reviewed today, I observed Mr. Morales getting out of his car, taking the crutches out of the back, and walking away. Carrying the crutches in his left hand, he walked in a perfectly normal fashion with no evidence of a lim[p]. I also observed him playing soccer . . . with children. Although, he did have a wrap around the right knee, I was quite impressed with his ability to walk and run both forward, backward, and sideways[,] and kick the ball with the right leg."[2] Dr. Branscum testified at trial he was "[v]ery much" surprised to see defendant playing soccer. Dr. Branscum also testified if defendant participated in activities like playing soccer with his kids from time to time, that could have added to the knee injury he incurred in 2003. After viewing the DVD evidence, Branscum rescinded his earlier 50 percent apportionment to Weber and declined to offer any apportionment.

From this evidence, the jury could reasonably infer defendant deliberately failed to disclose to Branscum the occurrence of recent events and activities captured on DVD in which he walked without crutches in a perfectly normal way and played soccer in the backyard with his kids. The jury could also infer disclosure of these events and activities to Dr. Branscum would have affected either defendant's entitlement to benefits or their

---

[2] The report excerpts read to the jury also included Branscum's comments on other portions of the surveillance tapes in which defendant was seen walking without evidence of a limp or other gait abnormality, dismounting a motorcycle and walking away in a normal fashion, pushing a cart full of groceries, and placing a grocery bag into a car.

18

amount because they directly negated defendant's claim of severely limiting disability arising from his former employment by Weber. Sufficient evidence therefore supports his conviction for insurance fraud in count five.

## B. *Admission of Prior Conduct Evidence*

Before trial, the prosecutor moved to introduce into evidence defendant's prior conduct of defrauding other insurers by filing workers' compensation claims, under Evidence Code section 1101, subdivision (b), to show defendant's intent and a common scheme or plan.[3] The prosecutor specifically sought to introduce defendant's prior claims against three of his past employers—R&A, H&R Graphics, and Acuprint. The prosecutor argued defendant's uncharged conduct was similar in these instances to his conduct in the charged case, in that he "filed workers['] compensation claims against employers days or months after leaving their employ, generally without reporting the injury during his employment, . . . with the veracity of each of those claims being independently questioned by doctor[s] who subsequently examined [him]." The prosecutor also argued the probative value of the evidence was not substantially outweighed by the risk of undue prejudice under Evidence Code section 352.[4] The uncharged acts tend to prove an intent to commit insurance fraud, which was an essential element of the prosecution's burden of proof, as well as a common scheme or plan. Although such evidence might be damaging to defendant's case, the prosecution argued it did not create an emotional bias against him independent of its relevance to material issues.

---

[3] Evidence Code section 1101 states in relevant part: "[E]vidence of specific instances of [a defendant's] conduct . . . is inadmissible when offered to prove his or her conduct on a specified occasion [¶] [except when] . . . evidence that [the defendant] committed a crime . . . or other act [is] relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act."

[4] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Over defendant's objections, the court allowed evidence of defendant's workers' compensation claim against R&A to show intent and a common plan and scheme, but it denied admission of evidence pertaining to defendant's two 1991 workers' compensation claims. On appeal, defendant argues intent was not seriously contested at trial, the events concerning the R&A claim were not so similar to those involving Weber as to evidence a common scheme or plan, and even if probative on these issues, the prior incident should have been excluded under Evidence Code section 352. He argues admission of the evidence violated his federal constitutional rights to due process and equal protection.

We review a trial court's ruling on the admissibility of evidence for abuse of discretion. The trial court enjoys broad discretion in assessing the admissibility of evidence. (*People v. Kipp* (1998) 18 Cal.4th 349, 369 [admissibility ruling under Evid. Code, § 1101 is essentially a determination of relevance reviewed for abuse of discretion]; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 [trial court's evidentiary ruling will not be disturbed on appeal unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice].) Admission of other acts evidence that is relevant and not unduly prejudicial does not violate a defendant's due process or equal protection rights. (*People v. Falsetta* (1999) 21 Cal.4th 903, 917–919; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1025–1030.)

The trial court's decision to admit evidence concerning defendant's R&A claim was not arbitrary, capricious, or absurd. As the trial court pointed out, the R&A and Weber incidents were strikingly similar not only because of the late filing of the claim and nonreporting of the injury, but also because both were based on confirmable medical conditions—a torn rotator cuff in the case of R&A and a serious preexisting knee injury in the case of the Weber claim. In both instances, it could be inferred defendant was trying to take advantage of an opportunity in which it would be difficult to disprove his injuries arose from his employment. In our view, there are sufficient similarities between the charged crimes and uncharged act that evidence of the latter supports an inference of defendant's fraudulent intent and of a common plan. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 401–403.)

20

We also cannot say the trial court abused its discretion in overruling defendant's objection under Evidence Code section 352. The limited evidence concerning R&A did not consume undue time or inject confusing issues into the trial. The risk in admitting the evidence was that it would be taken by jurors as proof of a propensity by defendant to engage in the type of conduct with which he was charged—committing fraud in order to obtain workers' compensation benefits. We do not believe this risk outweighed the evidence's probative value. We note at the outset the jury was properly instructed to consider the evidence only for the limited purposes specified in the court's instruction, and not as showing a propensity to commit crime or other improper purpose.

In *People v. Ewoldt*, the Supreme Court identified several relevant factors in determining whether relevant prior bad acts evidence should be admitted under Evidence Code section 352. These factors include the strength of the evidence in showing intent or a common plan, whether the defendant was punished for the charged conduct, whether the uncharged conduct was more inflammatory than the charged conduct, whether the uncharged conduct was remote in time, and the degree to which the source of the uncharged conduct is independent of and unaffected by the evidence of the charged conduct. (*People v. Ewoldt, supra*, 7 Cal.4th at pp. 404–407.) The most important factor is the tendency of the evidence to prove a contested issue. (*Id.* at p. 404.)

Here the R&A evidence had substantial probative value. First, and contrary to defendant's contention, intent was contested at the trial. Defendant testified on direct examination he did not file his workers' compensation claim against Weber to defraud the system, but because he was injured. The defense put on extensive evidence from Dr. Nolan to establish defendant's claim had a good faith basis. The defense never conceded defendant acted with fraudulent intent, but insisted on the prosecution's burden to prove the charges beyond a reasonable doubt. In fact, no tactical decision the defense made or could have made relieved the prosecution of having to prove criminal intent beyond a reasonable doubt to the satisfaction of all 12 jurors. The striking similarities between the two claims, as the trial court recognized, gave the R&A evidence considerable probative force in meeting that difficult burden.

21

Defendant concedes the R&A evidence was less inflammatory than the charged conduct, and was not remote in time. While it is true defendant incurred no punishment for his allegedly fraudulent conduct in the R&A matter, in fact receiving a settlement in that case, this does not create an undue risk the jury would punish him for the uncharged fraud. Given the much more compelling evidence of defendant's fraudulent conduct in pursuit of the Weber claim—the surveillance evidence, the deposition testimony, defendant's misrepresentations to Dr. Branscum—we find there was little danger the jury would have punished him for the R&A claim instead of or in addition to the charged conduct.

Defendant also maintains the evidence of the uncharged crime was not independent of and unaffected by the Weber evidence since defendant was deposed and medically evaluated for both cases at the same time. While there was overlap in the investigations, the prosecution presented the key evidence concerning the two cases mainly through different witnesses. Dr. Branscum performed the QME in both cases, but he wrote separate reports evaluating the injury claims in the two matters. The Weber report focused on defendant's knee and the R&A report on his shoulder injury. Both initial reports were written before Branscum was made aware of investigative evidence showing defendant had tried to deceive him about the severity of his injuries. As noted, there was no question defendant had injuries to his knee and shoulder. The only issues were the level of his disability and its apportionment to his former employers. With regard to the R&A claim, Branscum found defendant had a shoulder disability that precluded heavy overhead lifting. There was no evidence Branscum's concerns about defendant's magnification of his knee injury in the Weber case influenced his apportionment of defendant's shoulder injury. The latter appeared to be based solely on Branscum's knowledge and experience that rotator cuff injuries could not occur from the type of activity defendant performed during his two-week stint at R&A. Branscum testified he had simply "never heard" of that type of work causing rotator cuff tears. In contrast, Branscum agreed defendant's work at Weber could have contributed to his knee condition. We do not find the sources of the evidence concerning the two workers'

22

compensation claims overlapped sufficiently that the R&A evidence should have been excluded on that ground. Absolute independence is not in any event required. (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 405.)

We find no abuse of discretion or violation of defendant's due process or equal protection rights in the trial court's admission of the other acts evidence.

### III.  DISPOSITION

The judgment is affirmed.


_____
Margulies, Acting P.J.


We concur:


_____
Dondero, J.


_____
Banke, J.