Filed 3/13/15  P. v. DeShields CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT DESHIELDS,<br><br>        Defendant and Appellant. | C070131<br><br>(Super. Ct. No. 11F02689) |

A Chihuahua survived strangulation and anal penetration.  A jury found defendant Robert DeShields guilty of animal cruelty (Pen. Code, §§ 597, subd. (b); undesignated statutory references are to the Penal Code) but was unable to reach a verdict on a count of sexual assault of the dog for purposes of arousing or gratifying defendant's sexual desire (§ 286.5).  On appeal, defendant contends the trial court abused its discretion in (1) allowing evidence of prior conduct to show a plan or design of unauthorized contact with

1

dogs with a sexual overtone (Evid. Code, § 1101, subd. (b)), and (2) ordering defendant to register as a sex offender (§ 290.006) based on the court's finding that defendant committed animal cruelty for a sexual purpose. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Defendant was homeless but needed a residence for government assistance. From November 2010 through March 2011, he paid to live in the garage of a house occupied by Tiarra Urrabazo, her four small children, and Adrian Perez (father of three of the children). Defendant was friendly with Urrabazo's mother, Doralisa Amezquita, who was semi-homeless and sometimes stayed at the house with her pit bull puppy, Rocco. Amezquita did not approve of nonfamily members living in proximity to her grandchildren.

Defendant uses a wheelchair, though he can walk for short periods of time. He was allowed to use the bathroom in the house but sometimes defecated in the backyard and emptied urine from his catheter bag into bottles he then kept in the garage, to the family's displeasure.

The family acquired a six-pound male Chihuahua named Shadow. The women repeatedly told defendant they did not want Rocco or Shadow to be in the garage, except when the women were in the garage using the washer and dryer. Amezquita wanted Rocco to stay outside in the yard because he had a rash, was aggressive with other dogs (including Shadow), and had frightened the children. After the rash cleared, Amezquita still did not want Rocco in the garage because Rocco once chewed defendant's catheter after defendant had removed it from his penis. The women did not want the dogs to be around the unsanitary conditions of defendant's personal hygiene, particularly Shadow, who was in constant contact with the children.

Over defense objection, the trial court allowed evidence of incidents where defendant had one or the other dog in the garage. Amezquita twice found Rocco on the

2

couch with defendant in the garage. Once, defendant was under a blanket and the dog was on top of the blanket. The other time, the dog was under the blanket with defendant, whose underwear was showing, hanging off the side of his hip. Amezquita asked why he had the dog close to his skin when the dog had a rash, but defendant just said the dog needed to be inside.

Amezquita once found Shadow in the garage, under the blanket with defendant. Defendant sat up and revealed he was wearing a Speedo bathing suit and a shirt. A second time, Amezquita entered the garage and yelled at defendant about the stench. He had Shadow under the blanket with him, and the draping of the blanket allowed her to see defendant was naked from the waist down. Each time, Amezquita got mad and threatened defendant that she would call law enforcement to have him removed.

Early on Sunday, March 27, 2011, Amezquita saw defendant in the garage sitting in his wheelchair, nude, with Shadow on his lap. Defendant had his hands on the dog's neck and back but was not restraining the dog. Amezquita put the dog, who seemed fine, in a bedroom and left the house. The dog went missing that day. Defendant professed ignorance. Monday night, Amezquita told defendant *he* would be missing if the dog were not found by Tuesday morning.

Around 2:00 a.m. on Tuesday, March 29, 2011, Amezquita was in the kitchen, heard defendant ask for water, saw defendant soaking wet, and slammed the garage door shut.

A couple of hours later, Amezquita went into the garage and saw defendant sitting with a small wastebasket on his lap. He said he had found the dog. An apparently lifeless Shadow was curled up in the wastebasket. Defendant said he was giving the dog a bath because "it was full of shit and fleas." He would not say where he found the dog. Amezquita went to wake her daughter. They returned to the garage to find defendant pouring cold water on the dog in the bucket. Defendant said he found the dog behind the recliner in the garage. The dog's eyes were open and bloodshot, and he was limp. The

3

women wrapped him in a blanket that came away with red stains. The dog moved a bit on the floor, dragging his hind legs and leaving a small trail of pink or red liquid on the floor. His rectum was open to the size of a silver dollar. Defendant said he saw the blood and figured Rocco must have scuffled with Shadow.

The family called law enforcement. When police later entered the garage to arrest defendant, he was sitting in the dark with a jacket over his head and his pants pulled down below his knees, exposing his flaccid penis without the catheter.

A county animal shelter veterinarian examined Shadow late afternoon on Tuesday, March 29, 2011. The dog had bloodshot eyes, hair loss on his neck, bruising on his penis, and bruising and inflammation of his scrotum. Shadow's external anal sphincter was partially open, about the size of a quarter, and was inflamed and red, with blood seeping from his anus. He had no bite wounds or lacerations. His injuries looked recent, within the past 24 hours. Shadow had suffered an anal penetration with traumatic overstretching, which required suturing of his rectum and colon. The doctor opined Shadow's bloodshot eyes were the result of manual strangulation, which would not necessarily leave visible bruising on the dog's neck. In the doctor's opinion, Shadow had been choked unconscious, because the anal injuries would have been impossible to inflict otherwise, and the level of blood in the eyes and elevated liver enzymes supported the conclusion that the dog had been rendered unconscious. The doctor believed the injuries occurred within 24 hours before the examination on March 29th. The freshness of the injuries indicated they did not occur on or before March 27th.

Two other veterinarians also examined Shadow and testified to the same injuries. The width of the object that penetrated Shadow's anus was three-quarters of an inch or larger. The dog was still seeping blood from his anus on March 30, 2011.

Tests found no sperm or human DNA.

Adrian Perez testified he did not hurt Shadow.

4

Amezquita admitted she used defendant's bank card to withdraw almost $1,500 of his money without his permission, for which she could be prosecuted.

Defendant did not testify. He had witnesses testify to his medical condition and that he was good with dogs.

The jury found defendant guilty of animal cruelty but was deadlocked on the count of sexual assault of a dog. The trial court declared a mistrial as to the sexual assault count. The court found true the prior prison term allegations (§ 667.5, subd. (b)) for defendant's prior convictions--six prior convictions for drug offenses, mostly for drug possession, in 1987, 1996, 2001, 2002, 2004, and 2006; receiving stolen property in 1988 and 1990; evading police in 1992; and auto theft in 2005.

In December 2011, the trial court sentenced defendant to a total term of 10 years: The upper term of three years on Count One animal cruelty, plus seven consecutive one-year terms for each prior prison term enhancement. Count Two, sexual assault, was dismissed at the People's request. Exercising its discretion under section 290.006, the court ordered defendant to register as a sex offender.

DISCUSSION

I

*Evidence Code Section 1101*

Defendant contends the trial court erred in admitting evidence (of his prior contacts with the dogs, nudity, and hygiene) pursuant to Evidence Code section 1101, subdivision (b), to show a plan or design of "unauthorized contact with dogs with a sexual overtone." We need not address the parties' arguments on admissibility because, even assuming error for the sake of argument, it was clearly harmless because the evidence was relevant only to the sexual assault charge, and the jury could not reach a verdict on the sexual assault charge.

5

A. *Background*

In cross-motions in limine, defendant sought to exclude, and the prosecutor sought to introduce, evidence of defendant's contacts with the dogs in the garage and his hygiene. Defendant argued there was no evidence that he had an erection, that either dog was hurt, or that anything of a sexual nature was happening, and his hygiene was irrelevant and prejudicial. The People argued the evidence was admissible under Evidence Code section 1101, subdivision (b), on the issues of identity, intent, and common design, and the hygiene issues were relevant and probative to the family's house rules that defendant not have the dogs in the garage.

The trial court questioned whether Evidence Code section 1101 applied at all but nevertheless ruled on the issue, concluding the evidence was not admissible to show identity or intent, but it was admissible to show a common plan or design, and its probative value outweighed its prejudicial effect under Evidence Code section 352. The court noted the hygiene issue did not imply a sexual aspect, but the other evidence did, making it potentially inadmissible character evidence under Evidence Code section 1101. Defendant's disobedience of the dog owners' instructions not to be in contact with the dogs created an implication of the character or trait of unauthorized or illicit contact with the dogs which, together with the nudity, was admissible to show a common plan or design "to come into unauthorized or illicit contact with these dogs in the household, including a possible sexual overtone to the contact." In ruling the evidence admissible, the trial court weighed the factors favoring exclusion (that Amezquita was the source of evidence for both uncharged conduct and charged offenses, and that defendant suffered no consequences for the prior conduct) against the factors favoring admissibility (that the prior conduct was not more inflammatory than the charged offenses, not remote in time, and not cumulative). The court ruled the hygiene evidence was relevant to the reasons

for the family's house rules prohibiting defendant's contact with the dogs, because of the unsanitary conditions.

The trial court instructed the jury on the limited use of evidence of defendant (1) in bed with Rocco above the covers; (2) in bed, clothed with Rocco when Rocco had a rash, under the covers; (3) in bed with Shadow above the covers; (4) in bed naked with Shadow under the covers; and (5) in a wheelchair, naked, with Shadow on his lap, holding Shadow by the chest. The court instructed the jury, "If you decide that the defendant committed any of this conduct, you may, but are not required to, consider any such conduct that you decide the defendant committed by a preponderance of the evidence only for the limited purpose of deciding whether or not: [¶] The Defendant had a plan or scheme to commit the offenses alleged in this case. [¶] Do not consider this evidence for any other purpose. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit the crime. [¶] If you conclude that a preponderance of the evidence shows that the defendant committed any one or more of these acts, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the crimes charged. The People must still prove each charge and allegation beyond a reasonable doubt."

In closing argument, the prosecutor told the jurors: "I'm not offering this to show his predisposition to commit a rageful, brutal act on the dog, but to show a pattern manifesting a sexual interest and mind-set, and undercurrent to explain the sexual aspect of the crime. . . . [¶] . . . [¶] This man has spinal stenosis. He has a catheter. He suffers frequent urinary-tract infections. The man has a right to be in his private area naked. There is no problem with that. He has that right. [¶] But when an owner and occupant of that house tells him to stop something, why cause an issue? And what is the motivating force behind causing an issue? That's where I'm going with it."

7

The defense argued to the jury that most dog owners let their dog sleep on the bed; defendant was showing compassion for dogs neglected by their owners; and defendant's nudity could be attributed to comfort in not having clothes touching the catheter required by his medical condition.

During deliberations, the jury asked the court to explain the instruction directing it to determine whether defendant committed the act of sexual assault with the intent of arousing or gratifying his own sexual desire, because "We cannot get into the defendant's mind and this was not discussed in trial. Judge's instructions do not match the count 2. ([Instruction No.] 1181)." The court answered: "If you find that the defendant sexually assaulted the animal, the People are then required to prove that such assault was done to evoke, stir, or excite the defendant sexually or indulge, appeal, please, or satisfy the defendant sexually." The court, noting incompleteness of the instructions, then instructed the jury that animal cruelty was a general intent crime which required proof only that the defendant intentionally tortured or tormented an animal, and sexual assault was a specific intent crime, pursuant to the previous instructions. The court allowed the attorneys to reopen arguments. The prosecutor told the jurors to look at the circumstances to determine what is going on in the mind of the perpetrator. Defense counsel argued there was no evidence connecting defendant to hurting the dog, and the more likely perpetrator was Adrian Perez.

B. *Analysis*

Evidence Code section 1101 generally prohibits evidence of a person's character to prove his conduct on a specified occasion but provides in subdivision (b): "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, *or other act* [italics added] when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted

8

unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

"Evidence of a common design or plan . . . is not used to prove the defendant's intent or identity but rather to prove that the defendant engaged in the conduct alleged to constitute the charged offense." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393-394.) " [I]n establishing a common design or plan, evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' [Citation.] . . . [¶] To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. . . . [I]t need only exist to support the inference that the defendant employed that plan in committing the charged offense. [Citation.]" (*Ewoldt, supra*, 7 Cal.4th at p. 402.)

Defendant argues the trial court abused its discretion in allowing the evidence as relevant to common design or plan. (*People v. Lindberg* (2008) 45 Cal.4th 1, 23 [evidentiary ruling reviewed for abuse of discretion].) The People respond the ruling was proper, and the evidence was alternatively admissible on other grounds of intent, opportunity, or motive.

Assuming for the sake of argument that defendant's prior contacts with the dogs presented an Evidence Code section 1101 issue and further assuming the evidence should have been excluded, any error was clearly harmless, because the jury was unable to reach a verdict on the sexual assault charge, which was the only charge to which the evidence related. (*People v. Harris* (2013) 57 Cal.4th 804, 842 [standard for Evidence Code section 1101 error is whether it is reasonably probable the defendant would have obtained a more favorable result absent the evidence].)

The trial court allowed the evidence for its "sexual overtone," and that is how the prosecutor argued it to the jury: "I'm not offering this [prior conduct evidence] to show his predisposition to commit a rageful, brutal act on the dog, but to show a pattern manifesting a sexual interest and mind-set, and undercurrent to explain the sexual aspect of the crime."

Insofar as defendant suggests the jury may have applied the prior conduct evidence to the animal cruelty charge, we disagree. Defendant notes the jury instruction said nothing about "sexual overtone" but simply allowed the jury to use the evidence of prior nude contact with the dogs in deciding whether defendant had a plan or scheme to commit the "offenses," plural. However, assuming defendant has not forfeited the point by failing to request modification in the trial court, it is unlikely the jury misapplied the prior conduct evidence to the animal cruelty charge, for several reasons. (*People v. Williams* (2013) 56 Cal.4th 630, 688-689 [test is whether it is reasonably likely the jury would have misapplied the instruction].) First, the prior conduct evidence did not show animal cruelty. Second, the court instructed the jury that animal cruelty was a general intent crime which required proof only that the defendant intentionally tortured or tormented an animal. Third, as indicated, the prosecutor expressly told the jurors: "I'm not offering this to show his predisposition to commit a rageful, brutal act on the dog, but to show a pattern manifesting a sexual interest and mind-set, and undercurrent to explain the sexual aspect of the crime." No one argued sexual overtone with respect to the animal cruelty charge.

Defendant argues he was prejudiced because the instruction mentioned only the prior contacts and said nothing about defendant's hygiene or being naked when arrested after the dog had been removed from the house. He argues the jury was left free to use that evidence any way it chose. However, the hygiene evidence was not improper character evidence under Evidence Code section 1101, because it was not admitted "to prove [defendant's] conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).)

10

Rather, the trial court explained the evidence was separately admissible to explain the family's reasons for keeping the dogs out of the garage. The evidence was proper for this purpose, to rebut any inference that the women were arbitrarily depriving a disabled man of the companionship of dogs. And because the evidence of nude contacts with dogs was properly admitted, defendant was not prejudiced by evidence he was naked when arrested.

We conclude defendant fails to show grounds for reversal based on the trial court's evidentiary ruling.

## II

### *Sex Offender Registration*

Defendant argues the trial court abused its discretion in ordering him to register as a sex offender under section 290.006, because his offense was committed against a dog rather than a person, and the record does not support a finding that he is likely to commit sexual offenses similar to those listed in section 290 for mandatory sex offender registration. (*People v. Carmony* (2004) 33 Cal.4th 367, 377 [review for abuse of discretion].) We conclude the trial court did not abuse its discretion.

Offenses triggering *mandatory* registration under section 290 "may be characterized generally as sexual offenses committed by means of force or violence, violent offenses committed for sexual purposes, sexual offenses committed against minors, or offenses that involve the sexual exploitation of minors." (*Lewis v. Superior Court* (2008) 169 Cal.App.4th 70, 78, fn. omitted (*Lewis*).)

Section 290.006 by its own terms gives the trial court discretion to impose a registration requirement for persons convicted of offenses *other than* those listed in the mandatory registration statute of section 290. Section 290.006 provides: "Any person ordered by any court to register pursuant to the [Sex Offender Registration] Act for any offense not included specifically in subdivision (c) of Section 290 [mandatory sex

11

offender registration for persons convicted of specified offenses], shall so register, if the court finds at the time of conviction or sentencing that the person committed the offense as a result of sexual compulsion or for purposes of sexual gratification. The court shall state on the record the reasons for its findings and the reasons for requiring registration."

A discretionary order for registration does not depend on the specific crime of which a defendant was convicted, and the trial court may require a defendant to register under section 290.006 even if the defendant was not convicted of a sexual offense. (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1197-1198 (*Hofsheier*), overruled on other grounds in *Johnson v. Department of Justice* (2015) __ Cal.4th __, S209167.) Under section 290.006, the trial court must engage in a two-step process: (1) it must find--under a preponderance of evidence standard--whether the offense was committed as a result of sexual compulsion or for purposes of sexual gratification, and state the reasons for the these findings; and (2) it must state the reasons for requiring lifetime registration as a sex offender. (*Hofsheier*, *supra*, at pp. 1197-1198.) "By requiring a separate statement of reasons for requiring registration even if the trial court finds the offense was committed as a result of sexual compulsion or for purposes of sexual gratification, the statute gives the trial court discretion to weigh the reasons for and against registration in each particular case." (*Ibid*.) One of the purposes of registration is to assure that persons convicted of crimes within the scope of the registration statutes shall be readily available for police surveillance at all times because the Legislature deemed those persons likely to commit similar offenses in the future. (*Id*. at p. 1196.) "Where registration is discretionary, then, one consideration before the court must be the likelihood that the defendant will reoffend." (*People v. Garcia* (2008) 161 Cal.App.4th 475, 485 [trial court abused discretion by failing to consider defendant's evidence of rehabilitation], overruled on other grounds in *People v. Picklesimer* (2010) 48 Cal.4th 330, 338.)

The facts supporting registration need be proved only by a preponderance of the evidence. (*People v. Marchand* (2002) 98 Cal.App.4th 1056, 1058, 1063-1065

12

(*Marchand*) [preponderance of evidence test for discretionary order for sex offender registration].)

We note defendant on appeal has abandoned the argument he made in the trial court that the sexual purpose must be found by a jury beyond a reasonable doubt under *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435]. The trial court cited our rejection of a similar argument in *Marchand, supra*, 98 Cal.App.4th 1056, based on the nonpunitive nature of registration, and the trial court stated it did not consider it appropriate to anticipate a change in the law in light of Jessica's Law (§ 3003.5, approved in 2006 as Proposition 83), which prohibits registered sex offenders from living near a school or park. Since defendant abandons the issue, we need not address it. We nevertheless note the California Supreme Court recently held the residency restrictions of Jessica's Law are not subject to *Apprendi's* jury trial provisions. (*People v. Mosley* (2015) __ Cal.4th __ (2015 Cal.Lexis 1212).)

Here, the trial court expressly found by a preponderance of evidence that defendant committed the animal cruelty as a result of sexual compulsion and/or for purposes of sexual gratification. The trial court explained its reasoning: While defendant elicited some evidence of possible sexual impotence, it was contradicted by other evidence of his contacts with women and with the two dogs, and the act of anal penetration carried inescapable sexual attributes. The court also gave reasons for ordering sex offender registration. Defendant lived an unconventional lifestyle, including living on the street, had absconded from parole even in recent years while using a wheelchair, and had a long history of substance abuse including methamphetamine, as reflected in his criminal record. Although his criminal record showed a 1993 arrest for sexual molestation, it did not result in a conviction, and the trial court here stated it relied only on "proved convictions." Defendant "lacks normal societal boundaries, continues to desire, and seek, sexual stimulation, and is likely to engage in the use of substances, if available to him, that can further reduce those boundaries and increase those desires,

13

creating a serious danger to the public that he will act out by committing criminal sexual conduct." The court considered the psychological report submitted by the defense and stated that, although the psychologist opined the risk was low, he also said defendant is often angry, impulsive, irresponsible, and disconnected from reality, and likely to behave in a self-centered and sociopathic manner. The court also took into consideration defendant's test scores placing him in the low- to moderate-risk category. The court stated that, while the psychologist saw no direct link between sexual acts with dogs and sexual acts with humans, "the impulsive anti-social and sociopathic characteristics that were elsewhere referenced by [the doctor] in his report give the Court great concern. The concern is that [defendant] may commit a sexual crime against a person in the future, especially if he were to use illegal substances, as he has repeatedly done in the past."

Defendant argues there is no basis for the trial court's finding that he, as a drug user who committed a sex offense against a dog, is likely to commit a sex offense against a person. However, defendant cites no supporting authority requiring such a finding. He quotes from *Lewis, supra*, 169 Cal.App.4th 70: "Since the purpose of sex offender registration is to keep track of persons likely to reoffend, one of the 'reasons for requiring registration' under section 290.006 must be that the defendant is likely to commit similar offenses--offenses like those listed in section 290--in the future." (*Id*. at p. 78.) But section 290 is not limited to sex offenses. It includes "violent offenses committed for sexual purposes." (*Id*. at p. 78, fn. omitted.) Additionally, section 290, subdivision (c) expressly includes offenses of distributing obscene matter to minors (§§ 311.2, 311.4), including depictions of bestiality (§§ 311.2, subd. (c) [depiction of sexual conduct as defined in § 311.4], 311.4, subd. (d)(1) [sexual conduct includes bestiality].) Moreover, 290.003 is not limited to section 290 offenses. Accordingly, even though the trial court expressed concern about defendant committing a sex offense against a person, it suffices that the evidence supports a conclusion that defendant is likely to commit another violent act for sexual purposes.

14

Moreover, *Lewis* does not help defendant. There, a trial court in 1987 ordered *mandatory* registration where a 22-year-old defendant engaged in oral copulation with a 17-year-old girl. After the California Supreme Court held such mandatory registration violated equal protection, the defendant filed a motion asking the trial court to set aside the registration requirement. (*Lewis, supra*, 169 Cal.App.4th at p. 74.) The defendant argued a discretionary order of registration was not warranted since he had not committed a registrable offense in the past 20 years. (*Ibid*.) The trial court denied the motion, finding the crime was committed for the purpose of sexual gratification. (*Id*. at p. 75.) The appellate court held the trial court abused its discretion. The record did not support a conclusion that the defendant was likely to commit a type of crime listed in section 290. There was no evidence he used force or threats or coercion. To the contrary, the defendant had been acquitted of forcible oral copulation charges for the same acts. (*Id*. at pp. 75, 79.) Moreover, the defendant had committed no registrable offenses in the 20 years since the 1987 conviction. (*Id*. at p. 79.)

Here, in contrast to *Lewis*, defendant committed a violent offense (choking the tiny dog unconscious and penetrating its anus) for sexual purposes (as found by the trial court), and violent offenses committed for sexual purposes are among the types of offenses listed in section 290, as noted in *Lewis, supra*, 169 Cal.App.4th at page 78. Additionally, registration in this case was ordered for a recent offense, not an old offense as in *Lewis*.

Defendant argues an order unsupported by evidence violates federal and state due process. However, the order in this case was supported by the evidence.

We conclude defendant fails to show grounds for reversal.

DISPOSITION

The judgment is affirmed.


      HULL       , Acting P. J.


We concur:


      ROBIE       , J.


      DUARTE       , J.